COMMISSIONER OF INTERNAL REVENUE, Petitioner,

v.

ESTATE of Donald M. NELSON, Deceased, Lena M. Nelson, Executrix, Respondent-Petitioner.

No. 386, Docket 31853.

United States Court of Appeals Second Circuit.

Argued May 14, 1968.

Decided June 25, 1968.

William E. Murray, New York City (Jackson, Nash, Brophy, Barringer & Brooks, New York City, Roger D. Smith, and Martin A. Stoll, New York City, of counsel), for respondent-petitioner.

Stuart A. Smith, Washington, D. C. (Mitchell Rogovin, Asst. Atty. Gen., Dept. of Justice, Meyer Rothwacks, Loring W. Post, and Albert J. Beveridge, III, Attys., Washington, D. C., on the brief), for petitioner.

Before MOORE, HAYS and FEINBERG, Circuit Judges.

MOORE, Circuit Judge.

The Commissioner of Internal Revenue (the Commissioner) petitions to review a decision of the Tax Court which held that a deficiency of $28,286.88 in estate tax was due from the Estate of Donald M. Nelson (the Estate). The Commissioner had previously determined that there was an estate tax deficiency of $354,911.22, and the Estate had sought and obtained a redetermination of that deficiency. The Commissioner and the Estate appeal from the Tax Court's decision.

*The Facts*

Donald M. Nelson (Donald; also referred to in the Tax Court's findings of fact as the "decedent") and Helen W. Nelson (Helen) were married on December 18, 1926. They were divorced on January 19, 1945, pursuant to an Illinois decree. They had no issue. Thereafter, Donald married Lena. On September 29, 1959, Donald died. His widow, Lena M. Nelson, became the executrix of his estate.

This tax controversy centers around the events attendant to the 1945 divorce proceedings and the decree therein—particularly, in relation to a trust agreement dated January 19, 1945, which was a part of the divorce settlement.

*The Nelsons' Standard of Living Preceding the Divorce*

The Nelsons' way of life and Donald's financial position are succinctly summarized in the Tax Court's findings of facts as follows:

"Decedent was continuously employed by Sears Roebuck & Co. from 1912 until 1942. In 1939 he became executive vice president and chairman of the executive committee. He held these positions until 1942 when he resigned to become Chairman of the War Production Board, a wartime agency of the United States in Washington, D. C., where he remained until 1944. On occasion during the years 1943 and 1944, decedent acted as personal representative of the President of the United States to the Republic of China and the Soviet Union.

"During the period 1939–42, decedent's salary from Sears Roebuck was $75,000 per year and he received an additional $25,000 to $30,000 annually from dividends on his holdings of Sears Roebuck stock. His total income for that period was in excess of $100,000 per year. In 1944, decedent earned approximately $15,000 in salary from the Government and approximately $42,500 of dividends on his Sears Roebuck stock.

"Prior to his marriage to Lena, the decedent had been married to Helen W. Nelson from December 18, 1926 until January 19, 1945. Decedent and Helen had no issue.

"In 1931, after decedent became vice president in charge of merchandising of Sears Roebuck, he and Helen purchased a home at 595 Longwood Drive, Glencoe, Illinois, for $75,000. They lived there together until decedent went to Washington, D. C., in 1942, and Helen continued to live there until their divorce in 1945. The house was a 14-room mansion with three acres of land and a private beach. It required a large domestic staff including a 'live-in' couple, a laundress, and a gardener, as well as

extra help for large parties. During their years together in Illinois, the Nelsons maintained four automobiles, entertained lavishly, and led an active social life which involved a circle of wealthy and successful friends and acquaintances.

"During their marriage, the Nelsons traveled to Europe, South America, and the West Indies, as well as extensively within the United States. Decedent was a director of the Union Pacific Railroad and was provided with a private railroad car for trips within the United States. The Nelsons also owned a 65-foot yacht requiring a crew of five and having sleeping quarters for 14 passengers."

## The Divorce Settlement

"In early 1944 decedent informed Helen that he wanted a divorce. Helen informed decedent that she would agree to a divorce only if a property settlement could be worked out between them. Negotiations between the Nelsons' attorneys about the terms of the settlement agreement continued for almost a year." (Op. Tax Court)

Shortly before January 17, 1945, Helen agreed to a settlement and on that date filed an action for divorce in the Superior Court of Cook County, Illinois. On January 18, 1945, Donald and Helen entered into a settlement agreement providing in substance for a property settlement, waiver of alimony "and all other claims arising out of the marital status." Part of the property was the trust agreement which Donald agreed to execute and deliver "upon the entry of the decree of divorce" and if "for any reason whatsoever, the court refuses or fails to enter a decree of divorce within thirty days," the settlement agreement was to become null and void.

On January 19, 1945, the decree of divorce was entered, decreeing "that the parties hereto have settled all property and alimony rights" and barring all other claims "whether accruing out of the marital relations heretofore existing or otherwise."

On the same date and pursuant to the settlement agreement, Donald executed the trust agreement which had as its corpus 2,500 shares of Sears, Roebuck common stock having a then value of $261,250. At the date of Donald's death without issue on September 29, 1959, the value of the trust had increased to $1,-267,797.

## The Commissioner's Valuation

The trust agreement provided that it was "irrevocable" but could be "altered or amended from time to time by a memorandum in writing, executed by both Donald M. Nelson and Helen W. Nelson and delivered to the Trustee, * * *." The Commissioner, relying on Sections 2038 and 2043 of the Internal Revenue Code of 1954 [1] which provide in

1. *Section 2038 of the Internal Revenue Code of 1954:*

§ 2038. Revocable transfers.

(a) In general.

The value of the gross estate shall include the value of all property.

(1) Transfers after June 22, 1936.

To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power (in whatever capacity exercisable) by the decedent alone or by the decedent in conjunction with any other person (without regard to when or from what source the decedent acquired such power), to alter, amend, revoke, or terminate, or where any such power is relinquished in contemplation of decedent's death.

*      *      *      *      *

(b) Date of existence of power.

For purposes of this section, the power to alter, amend, revoke, or terminate shall be considered to exist on the date of the decedent's death even though the exercise of the power is subject to a precedent giving of notice or even though the alteration, amendment, revocation, or termination takes effect only on the expiration of a stated period after the exercise of the power, whether or not on or before the date of the decedent's death notice has been given or the power

substance that a decedent's gross estate shall include any transfer in trust made subsequent to June 22, 1936 as to which the decedent reserved the power to alter or amend "alone or by the decedent in conjunction with any other person" less "the value of the consideration received therefor by the decedent," included the entire 1959 value of the trust in excess of the 1945 value of the consideration. The Commissioner further determined that the consideration Helen had given in 1945 was equivalent to the value of Helen's support rights at the time of the divorce.[2]  If the value of these rights equalled the value of the trust property in 1945, no part of the trust would be includable in the estate. However, the Commissioner argued that the annual value of these rights was $20,000 and by actuarial calculations[3] computed the value of this amount for life or until possible remarriage as $216,571.38. This 1945 amount he then deducted from the 1959 value of the trust $1,267,797.81 and, on this addition to the Estate, i. e.,

$1,051,226.43, assessed a deficiency of $354,911.22 against the Estate.

*The Tax Court's Valuation*

Before the Tax Court, the Commissioner and the Estate proceeded "on the premise that the trust estate should be viewed as a unified package.  Neither discusse[d] the possibility of a starting point which fragments the trust into the various interests created." (Op. Tax Court.)  The Tax Court then fixed its own valuation by employing "a fragmented as distinct from a unified approach to the trust involved herein."  It dissected the interests broadly as follows:

(a) During Donald's lifetime and until Helen's remarriage, Helen was to receive the entire income.[4]

(b) Upon Helen's remarriage, Donald living, two-thirds of the then principal to Donald;  one-third to continue in trust, income to Helen and upon Helen's death the principal (one-third) to Helen's appointees or distributees.

has been exercised. In such cases proper adjustment shall be made representing the interests which would have been excluded from the power if the decedent had lived, and for such purpose, if the notice has not been given or the power has not been exercised on or before the date of his death, such notice shall be considered to have been given, or the power exercised, on the date of his death.
*    *    *    *    *
*Section 2043 of the Internal Revenue Code of 1954:*
Section 2043.  Transfers for insufficient consideration,
(a) In general.
If any one of the transfers, trusts, interests, rights, or powers enumerated and described in sections 2035 to 2038, inclusive, and section 2041 is made, created, exercised, or relinquished for a consideration in money or money's worth, but is not a bona fide sale for an adequate and full consideration in money or money's worth, there shall be included in the gross estate only the excess of the fair market value at the time of death of the property otherwise to be included on account of such transaction, over the value of the consideration received therefor by the decedent.

(b) Marital rights not treated as consideration.
For purposes of this chapter, a relinquishment or promised relinquishment of dower or curtesy, or of a statutory estate created in lieu of dower or curtesy, or of other marital rights in the decedent's property or estate, shall not be considered to any extent a consideration in "money or money's worth."

**2.** Section 2043(b) states that a relinquishment of marital rights in decedent's estate shall not be consideration in money or money's worth.  However, it is conceded that the relinquishment of support rights may qualify as such consideration.

**3.** $20,000 x life expectancy, age 53, modified by possibility of remarriage (10.66982) and by the quarterly payment factor (1.01488).

**4.** On January 27, 1959, Helen and Donald amended the trust agreement to permit Helen to withdraw 3/20ths of the shares of Sears, Roebuck in the trust, no later than December 31, 1960, with appropriate adjustments therefor in the trust.

(c) If Helen died and had not remarried before Donald's death, seven-twelfths of the principal was to be paid to Donald, the remaining five-twelfths to Helen's appointees or distributees.

(d) Were Donald to die before Helen, three-fourths of the principal was to be paid to Helen, the remaining one-fourth to continue in trust, income to Helen for life, upon her death the principal to Donald's surviving issue or absent such issue to Helen's appointees or distributees.

As to (a)—life interest in entire income—the Tax Court took the life expectancy factor of .48377 and applying it to the 1945 value of the trust ($261,-250) reached a figure of $126,384.91. To this amount, the Court added $70,-333.73 representing Helen's right upon survival to three-quarters of the principal, namely, ¾ of $261,250 x .35896, survival factor.

The Court evaluated two other possibilities, (1) Helen's remarriage and right to dispose of one-third of the principal as $44,955.03 (⅓ x $261,250 x .51623) and (2) Helen's right, predeceasing Donald, to dispose of five-twelfths of the principal as $30,250.57⁵⁄₁₂ x $261,-250 x .27791).

The Court then took "the highest of these various values, i. e., the point of view most favorable to the respondent [the Commissioner]" as $196,718.64 ($126.384.91 plus $70,333.73) and finding it less than the consideration which she furnished (conceded by the Commissioner to be $216,571.38) held that as to the values represented by items (a) and (b) that "full and adequate consideration" had been paid therefor and the exclusionary condition of Section 2038(a) had been met.

With respect to (c)—Donald's interest in seven-twelfths of the principal if Helen predeceased him or remarried—the Court found that "the decedent's (Donald's) death prevented the interest from ever taking effect and it is therefore not a proper subject of tax." As to (d), however,—contingent remainder in one-quarter of the principal to Donald's issue, absent issue to Helen's appointees or distributees—the Court held that Harris v. Commissioner of Internal Revenue, 340 U.S. 106, 71 S.Ct. 181, 95 L. Ed. 111 (1950), did not apply and that no consideration had been paid for this interest which was not " 'founded' upon the divorce decree so as to provide a substitute for actual consideration under the Harris doctrine."

Out of all these permutations and combinations came the Tax Court's deficiency of $28,286.88. Naturally, the Commissioner prefers his deficiency of $354,911.22 and the Estate believes that, full value having been delivered, no deficiency exists. Before embarking upon a search for tax truth, the Commissioner's concession "that no part of the trust would be includable if Helen furnished consideration equal to or in excess of the value of the total assets transferred, $261,250." (Com'r's Reply Brief, p. 11), definitely limits the factual issues to an evaluation of the consideration given. The Commissioner "submit[s] that the question is properly one of fact which should be determined by the Tax Court in the first instance" and that "in fairness to both parties, the case should be remanded to the Tax Court with directions to make a finding in accordance with the foregoing criteria [as set forth in E. T. 19, 1946—2 Cum.Bull. 166, 169]." (Id. pp. 7–8.)

The Estate "urges this Court to infer from the opinion and record below that the annual value of Helen's support rights was at least $24,127—which would result in consideration of at least $261,251 when the total value is computed actuarially." (Id. p. 7.)

There is no evidence from which it can reasonably be inferred that during the period of almost a year of negotiations between the Nelsons' attorneys that the attorneys and/or their clients sat across from each other at the bargaining table equipped with slide rules and mortality and actuarial tables. It would be highly unreasonable to assume that they, even if armed with this equip-

ment, evaluated each provision of the trust by actuarial methods and then added the total to obtain a consideration figure. They were (for all that appears in the record) bargaining fairly and at arm's-length. Both sides knew the Nelsons' standard of living, quite graphically depicted by the Tax Court. The record does not reveal the rationale of the Commissioner's determination of $20,000 as a proper value for annual support. There is, however, testimony that in the Illinois Superior Court of Cook County that the Court would, upon the facts here presented, "award the wife alimony in a sum not less than $25,000, but more than likely up to $30,000 or more; and percentage-wise, approximately one-third of his [Donald's] income."

If the annual support figure equals or exceeds $24,127 by the Commissioner's concession, full consideration was given, the trust is not part of the estate and no deficiency results. Thus, a determination of this figure becomes basic to a resolution of the tax question.

When the parties expressed their assent in 1945 to their divorce settlement agreement, it is fair to assume (and there is no proof to the contrary) that they did not do so on the basis that a Tax Commissioner or Tax Court over fifteen years later would declare Helen's right of support to be worth $20,000 or that the trust was to be analyzed and valued by "a fragmented as distinct from a unified approach." As an exercise in the evaluation of the various possible interests created by the trust, the Tax Court's approach is readily understandable; but equally so are the merits of the "unified" theory. Nor is it necessary at this time to speak of the applicability of Harris v. Commissioner of Internal Revenue, 340 U.S. 106, 71 S.Ct. 181, 95 L.Ed. 111 (1950) because the problem may never arise.

The trust was intended to be for Helen's benefit and a vital part of the divorce settlement—in fact, it was an important consideration for the relinquishment of her rights. In many ways, the Sears, Roebuck stock was hers. She was to receive the entire income therefrom during Donald's life and until her remarriage, and upon Donald's death three-quarters of the principal. The key, however, in the law is found in the words "adequate and full consideration in money or money's worth," namely, the value of Helen's support rights which she surrendered which, in turn, may well depend upon a resolution of such fact questions as the amount of alimony usually awarded in divorce actions in Illinois at the time of this divorce. The suggestion of the Commissioner of a remand to the Tax Court for such a factual determination is accepted.

Reversed and remanded to the Tax Court for the purposes outlined in this opinion.