Eldon M. DIXON, Executor Under the Last Will and Testament of Lewis M. Dixon, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 67 C 595.

United States District Court, E. D. New York.

Aug. 27, 1970.

Homer I. Harris, New York City, for plaintiff.

Donald R. Anderson and Robert J. Hipple, Washington, D. C. (Johnnie M. Walters, Asst. Atty. Gen., and Edward R. Neaher, U. S. Atty., of counsel), for defendant.

## MEMORANDUM AND ORDER

DOOLING, District Judge.

Plaintiff sues to recover so much of the estate tax paid to defendant on the estate of Lewis M. Dixon, who died on October 13, 1961, as was based on the inclusion in Dixon's gross estate of the alleged value at the date of Dixon's death of certain interests in the *corpus* of a trust that he had created in 1948 in connection with his separation and divorce.

It is concluded that the defendant is entitled to judgment.

The corpus of the 1948 trust was 15,-000 shares of the stock of Columbia Rib-

bon & Carbon Mfg. Co., Inc. That stock had split 10 for 1 between 1948 and 1961, and had paid a 20% stock dividend between 1940 and 1948; so, 1,000 1940 shares were 1,200 1948 shares and 12,000 1961 shares. The stock had a value in terms of 1961 shares at the various relevant dates as follows:

| Date | Value per 1961 share |
|------|------|
| December 31, 1940 | $ 2.705 |
| November 30, 1948 | 7.754 |
| October 13, 1961 (death) | 20.00 |

Dixon apparently was married to Addye Yeargain in 1933. They were, it appears, childess, but Dixon had a son, Eldon M. Dixon, evidently by an earlier marriage. In any case Dixon on December 31, 1940, transferred to himself and his wife Addye as trustees 1,000 shares of Columbia stock, vesting in the wife a life estate and the power to appoint the remainder by will, with a gift over to her statutory distributees in default of appointment; in addition, if the wife outlived her husband she took the shares absolutely. If the 1940 instrument was not unreal, the wife's interests approached the totality of ownership of the beneficial interest in the Columbia shares, but the instrument was replete with provisions subjecting the trustees to Dixon's investment directions, requiring retention of the Columbia stock, giving Dixon the sole power to remove and substitute trustees, and empowering Dixon to vote the Columbia shares.

In 1948 Dixon and his wife separated, and executed a separation agreement under date of November 30, 1948. It recited the 1940 trust and stated that the trust was being "added to, modified and additional shares given to the Wife by the Husband * * * for which a new and separate trust agreement is being executed by the parties." Under the separation agreement Dixon transferred to his wife the following—

| Item | Value (1948) |
|------|------|
| House and furnishings | $28,000. (about) |
| Reimbursement for household expense | 875. |
| Insurance policy | 6,500. |
| 250 shares of Columbia (outright) | 19,385. |
| Attorney's fee | 1,500. |
| Total | $56,260. |

Under the separation agreement Mrs. Dixon relinquished (a) her support rights and (b) her right in Dixon's estate under the Decedent Estate Law, and Dixon relinquished his rights in his wife's estate. The record throws no light on the extent of Mrs. Dixon's property, or, indeed, of Dixon's at the time and hence there can be no estimate of the value involved in the cross releases of rights to share in each others estates. It is simply stipulated, confusingly, that Dixon's 1948 income taken from the "joint return" for that year, was $45,-715.25 "including $10,800 income from the 1940 trust"; that appears to mean that Dixon's income was $34,915.25 and his wife's income from the trust was $10,800, unless it is intended to suggest that the $10,800 was really Dixon's income and that the 1940 trust was unreal. (It has also been stipulated that the average income of the 1948 trust from 1949 through 1967 has been $12,750 a year, an average of $8.50 on each 1948 share.)

Although the data do not suffice genuinely to establish the value of what Mrs. Dixon relinquished, manifestly her support right had significant value, and, for present purposes, it might be supposed— on various factual assumptions—that it was worth the "present value" in 1948 of $10,000 to $13,500 a year for the period measured by the expectation of life of the first to die of two persons aged 70 and 67 for Dixon was then 70 and she 67. On the 3½% tables used by the Commissioner and under Example 4 of IRS Publication No. 11 such a life interest would represent 20.152% of the value of a capital sum; the comparable annuity factor would appear to be between 5.9 and 6.2 times. If Mrs. Dixon's sup-

port right were measured on the annuity basis at its 1948 present value (using the 3½% table) it would appear to have been roughly $60,000 to 80,000; the 1948 value of the related 3½% "life estate" in a fund then worth $116,310 (1,500 shares at $77.54 each) would be about $23,439. (The radical difference is due to the fact that a 3½% table assumes that a $116,310 fund would yield about $4,070 a year. The 1,500 shares in 1948 paid a dividend of $9, or $13,500. Applying a 3½% annuity factor to that yields a very high figure—implying a fund, on 3½% assumptions, of about $300,000 to $400,000).

In addition to the separation agreement Dixon executed with his wife and one Crowe as trustees a new Indenture of Trust: it recited the execution of the earlier trust, that it now embraced 1,200 Columbia shares (worth $93,048.), that Dixon wanted to transfer 300 more shares (worth $23,262.) to the trust, and that Dixon and his wife wanted to cancel the 1940 trust "in all respects" so that the 1,200 Columbia shares together with the 300 shares owned by Dixon might be conveyed to Crowe and Mrs. Dixon; the indenture provided that husband and wife "hereby revoke, cancel and terminate" the 1940 trust and that the 1948 indenture shall "supersede and replace" it; and the new indenture then witnesses that Dixon (not Dixon and his wife) "has granted * * * and does by these presents grant * * * unto the Trustees [Crowe and Mrs. Dixon] * * * fifteen hundred * * * shares of * * * Columbia * * * together with the appurtenances and all of the estate and rights of the Donor [not Dixon and his wife] thereto." The grant was on a trust (i) to pay the income to Mrs. Dixon for life (she was then 67), (ii) then to pay the income in equal parts to her two sisters (then aged 54 and 49 respectively) for their lives, if they survived Mrs. Dixon, (iii) the Donor, Dixon, then to take the principal underlying each sister's life interest on her death (or on Mrs. Dixon's death if the sister failed to survive Mrs. Dixon), provided

Dixon survived his wife and such sister, or, if he did not so survive, (iv) then such principal share or shares to go to Dixon's son Eldon (who was then 31), or, if neither Dixon nor Eldon so survived, (v) then such share or shares to pass under Dixon's will. The trust indenture provided that if its income failed to equal $4 a Columbia share, then, at Mrs. Dixon's request, up to 500 shares could be sold (subject to the right of Dixon, Eldon, and Columbia, in that order, to acquire the shares at $70 a share); stock dividends were to be treated as principal; the trustees were required to hold the Columbia stock.

When Dixon died in 1961 he was survived by his former wife, by her sisters and by his son Eldon. All are still living.

What Dixon certainly additionally transferred by the 1948 trust was a life interest in an additional 300 shares of Columbia stock, worth $23,262, and expected to yield up to $2,700 a year. On the basis indicated above that interest could have a 3½% annuity value to the wife of about $16,200. From Dixon's point of view, the transfer amounted to subjecting the 300 shares of stock to life interests which, although they postponed and may have all but eliminated the possibility of his personally enjoying the property, yet left to him, his son, and his estate a complex but valuable set of interests. The value of the reversionary interest of the decedent at the moment before death the Commissioner computed at 17.052% of the value of the half of the shares supporting the life interests of Mrs. Dixon and the older of her sisters, and at 14.015% of the value of the other half of the shares; the two values aggregated $46,599; if the percentages were applied only to the 300 shares, worth $60,000, the values would aggregate $9,320. Just what transfers and exchanges are presented by the 1948 trust is a complex question. The differences between the 1940 and 1948 trusts are, *first*, that Mrs. Dixon has no interest beyond her own life-time in the 1948 trust whereas in the 1940 trust she had a life interest, a general power to appoint

by will, and a gift over to her distributees failing exercise of the power; *second,* that Mrs. Dixon's sisters receive secondary life interests in the 1948 trust and, *third,* that Dixon and his son Eldon receive interests in the principal in the 1948 trust. It might be suggested that Dixon was, as to substantial interests in 1,200 of the 1,500 shares transferee and not a transferor, in ultimate effect, since the new trust reduced his wife's beneficial interest in those 1,200 shares. Assuming that the secondary life estates granted to the sisters of Mrs. Dixon represented a disposition by Mrs. Dixon to her own kin or a grant by Dixon to them as a consideration granted to Mrs. Dixon, Dixon and Eldon in any case emerged with all of the interests in the trust principal (except possibly as to 500 shares), to come into enjoyment after the expiration of the successive life estates to Mrs. Dixon and her sisters; Dixon retained the property for himself if he survived the life interests and for his son or his testamentary distributees if he did not survive them. The valuation factors for the remainder after two lives at the date of the trust (using the Table from IRS Publication No. 11) were (for ages 67 and 54) 0.48950 and (for ages 67 and 49) 0.44150. Applied to the two halves of 1,200 shares then worth $93,048, the result is, on the Publication No. 11 basis, an indicated remainder value in 1948 aggregating about $43,300 (or about $54,140 if the base used is 1,500 shares).

Adding to the values that Dixon had transferred by the separation agreement ($56,260) the 1948 value of the life interests in the 300 shares added to the trust (computed on the Publication No. 11 basis) brought the total to about $68,693.54 ($56,260 plus $5,937.63 plus $6,495.91). On the other side, Mrs. Dixon relinquished a support right of uncertain value (somewhere in the range of $23,000 to $80,000), her right under New York law to take against Dixon's will, and the remainder interest in the 1,200 shares, valued on the 3½% table at $43,300.

The Commissioner included in gross estate on account of the trust $190,767. (The stipulation paragraphs 9 and 22 are incorrect in stating that the "deficiency * * * is attributable to the inclusion * * * of the value of the decedent's reversionary interest in a trust made up of 15,000 shares of stock in * * * Columbia" and "the decedent's reversionary interest in the trust was placed at $190,767," and that the reversionary interest of decedent "was valued at $190,767 by the Commissioner." The value of the reversionary interests, as the Commissioner viewed it in his August 10, 1962, letter would at the moment before death be about $46,599, or about $37,279 if 1,200 shares are used as a base. If the correct "reversionary value" should exclude the contingency of decedent's surviving some or all of the life tenants, since his death exhausted the value of that contingency and mooted its application (*cf.* Estate of Donald M. Nelson, 1966, 47 T.C. 279, 286, reversed and remanded on other grounds, 2d Cir. 1968, 396 F.2d 519; Estate of James H. Graham, 1966, 46 T.C. 415, 423–424), then under the Commissioner's letter of August 10, 1962, the factor for tax valuation of the ultimate reversion to the testator's estate (if Eldon failed to survive long enough to take one or both of the contingent remainders limited to him) would necessarily be different from the reversionary factor used to determine under Section 2037(a) (2) whether or not the testator had retained until his death a reversionary interest exceeding 5% of the value of the property. It does not appear that it could approach $190,767.)

The trust property was worth $300,000 at the date of death, and the Commissioner included in gross estate that amount less the life interests granted to Mrs. Dixon and her sisters. See 26 C.F.R. § 20.2037–1(e) (3); Mears v. United States, D.Mass.1961, 61–2 USTC 82, 071. The figure was evidently computed by using a 3½% table and the factors for the present value of $1 due at the death

of the survivor (a) of two persons aged 80 and 67 ($0.66265) and (b) of two persons aged 80 and 62 ($0.60913); each factor was applied to $150,000 since the indenture contemplated that each sister's secondary life interest extended only to one half the trust. No amount was included in gross estate on account of any interest granted in the trust to Mrs. Dixon, or indeed to her sisters.

■ The argument made against the tax is that the 1948 transfer was (in whole or part) made for an adequate and full consideration in money or money's worth, the consideration being Mrs. Dixon's relinquishment of her support right and of her interest in and power over the principal of the 1,200 shares in the 1940 trust. The argument is invalid. The estate has been taxed only on the interests that were not transferred to or at the instance of Mrs. Dixon, and no tax has been imposed by reason of interests transferred to her (whether for a consideration or gratuitously) or retained by her, or transferred to her sisters at her presumed request. To argue that the consideration Mrs. Dixon gave for what she got may be treated also as consideration for what she gave up, or, at the least, did not get, is "fantastic." Adriance v. Higgins, 2d Cir. 1940, 113 F.2d 1013, 1016. No matter from what source derived, whether by retention out of a gift Dixon made or by retransfer to him of an interest he had earlier given away, Dixon had at the moment preceding death an explicit reversionary interest valued on the 3½% basis at $46,599. His son Eldon had a remainder interest in the two separate halves of the trust contingent upon his surviving Mrs. Dixon, the one of her sisters who was the secondary life tenant of the respective halves of the trust, and his father, and contingent also upon his father's dying before the life interests terminated. Doubtless the value of Eldon's interest is computable separately, but it is evident that it can be sufficiently estimated (on the 3½% basis) by subtraction, for present purposes, at not less than $144,-168. It is not and can not be suggested

that either the reversion in Dixon or the transfer of the contingent interest to Eldon was made in consideration of what Mrs. Dixon relinquished, or in consideration of her right to support, or at her insistence, and failing such a showing, it remains that the decedent was the source of the reversion and of the contingent transfer and that the interests were not reserved and created for a consideration paid by Mrs. Dixon.

It might be argued, if fancifully, that Mrs. Dixon, not Dixon was to some extent the transferor of what Eldon was, contingently, to receive, but neither the instruments, the stipulated facts, nor the depositions of the attorneys who acted in the 1948 transaction support such an interpretation of the events. On the contrary, the trust instrument shows that to the extent that Mrs. Dixon made any transfer of interest in the 1,200 shares she made it to Dixon in exchange for what she and her sisters received. Dixon created the reversionary interest in himself and the contingent interest in Eldon out of the 300 shares he added to the trust in 1948 and the interests in the 1,200 shares that were revested in him by cancellation of the 1940 trust. They were not created at Mrs. Dixon's instance as a consideration for her relinquishing her support right or because she exacted as the price of relinquishing interests in the 1,200 shares to the decedent that he create interests in them for himself and Eldon. Estate of Robert Roger Glen, 1966, 45 T.C. 323, 344–345; Estate of Hubert Keller, 1965, 44 T.C. 851, 859–860.

Under Section 2037, then, the principal "transferred interest" involved is that limited to Eldon Dixon, and it is includible in gross estate because his interest was to vest in possession (a) only if he survived the decedent, and (b) the decedent retained a reversionary interest which exceeded just before his death 5% of the value of the trust property. The reversion in decedent himself is additionally includible in gross estate under Section 2033 if not under Section 2037. Cf. In re Hill's Estate, 2d Cir.

1952, 193 F.2d 724; Estate of James H. Graham, supra, 46 T.C. at 424, 431; Estate of Dwight B. Roy, Jr., 1970, 54 T.C. No. 125; 26 C.F.R. § 20.2037–1(e) (3).

Commissioner of Internal Revenue v. Estate of Nelson, 2d Cir. 1968, 396 F.2d 519 does not apply. There the Commissioner conceded (396 F.2d at 523, 524) that if the support right surrendered exceeded in value the entire value of the property transferred into the trust, none of the trust property was includible in gross estate. The Court, noting the protraction of the negotiation that preceded the creation of the trust and the complexity of the actuarial analyses required to single out the attenuated interest finally subjected to tax, questioned the reality of the Tax Court's allocation, on the evidence of the transaction that had been offered, of the consideration represented by the relinquishment of the support right to particularized interests in the property rather than to the ultimate transfer of the entire property: there was neither showing nor presumption that the negotiation adverted to the existence of interests susceptible of several actuarial evaluation. The decision did not suggest, nor can it be interpreted as meaning that the transaction is not to be examined to determine the transfers implicit in it and to identify the parties as transferors or transferees.

Plaintiff suggests that defendant cannot rely to any degree on Section 2033 to justify its retention of a tax collected under Section 2037. The tax was collected on the ground that the interests in the property other than the life tenancies were includible in gross estate. That ground of taxation is sustained, and it is not additionally necessary that the reason for inclusion be the same on which the Commissioner originally acted so long certainly as the change in reason, if there is any such change, has not embarrassed or prejudiced the plaintiff's presentation of its case. That is not the case here, for the Government's argument for inclusion under Section 2033 reflects only an alternative analysis and not such a change as would require or permit of new evidence on either side. The ultimate issue in such a refund case is whether the Government is in right and justice entitled to retain the amount of tax, not whether it assigned a correct ground as the support of its right. *Cf.* Stone v. White, 1937, 301 U.S. 532, 57 S.Ct. 851, 81 L.Ed. 1265; Zeeman v. United States, 2d Cir. 1968, 395 F.2d 861, 865.

It is, accordingly

Ordered that the Clerk enter judgment that plaintiff take nothing and that the action is dismissed on the merits with costs as taxed by the Clerk.