ESTATE OF ROBERT G. FENTON, DECEASED, MANUFACTURERS HANOVER TRUST CO., EXECUTOR, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10123–75.     Filed May 18, 1978.

*Karel Westerling,* for the petitioner.
*Theodore J. Kletnick,* for the respondent.

FORRESTER, *Judge:* Respondent has determined a deficiency in petitioner's Federal estate tax in the amount of $43,302.64. The sole issue for our decision is whether sections 2053(c)(1)(A)[1] and 2043(b) apply to limit petitioner's claimed deduction under section 2053(a)(3) for decedent's former wife's claims against his estate.

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.

## FINDINGS OF FACT

All of the facts have been fully stipulated and are so found. Those necessary to an understanding of the case are as follows:

Robert G. Fenton (hereinafter Robert) died on December 2, 1971, a resident of Nassau County, N. Y. Manufacturers Hanover Trust Co. is the executor of Robert's estate and its principal office is in New York, N. Y. Petitioner's Federal estate tax return was filed with the office of the Internal Revenue Service in Brooklyn, N. Y.

Robert and Catherine S. Fenton (hereinafter Catherine) were married on November 23, 1938. During their marriage, Robert and Catherine had one child, Alicia Sheldon Fenton, born on January 14, 1946. On January 7, 1960, Robert and Catherine entered into a separation agreement (hereinafter agreement). Articles First and Second of the agreement provided that Robert and Catherine should live separate and apart without interference by one another. Article Third provided as follows:

THIRD: Each party hereby waives, surrenders and releases to the other party any and all claims which he or she may or might have, or claim to have, against the other by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of this agreement, except as herein set forth, it being the intention of the parties that henceforth there shall be as between them only such rights and obligations as are specifically provided in this agreement.

Articles Fourth through Seventh provided that Catherine should have sole custody of Alicia subject to Robert's specified visitation rights and that Catherine should receive the family house, its contents, and a new automobile. The agreement further provided in part as follows:

EIGHTH: The parties hereto further agree that the husband so long as he shall live will pay to the wife, as and for her maintenance and support, the sum of Five Hundred Eight and 33/100 ($508.33) Dollars per month, commencing February 1, 1960, payable on the first day of each calendar month provided, however, that such payment shall cease if the wife shall die or, having been divorced, shall remarry. The parties further agree that the husband, so long as he shall live, will, until said child shall have reached her twenty-first birthday, pay to the wife or, in the event that the wife shall cease to be guardian of the said child, to such person as shall be the legally designated guardian of said child the sum of Sixty-Six and 66/100 ($66.66) Dollars per month, commencing February 1, 1960, payable on the first day of each calendar month, on account of the support and maintenance of said child provided, however, that such payment shall cease in the event that the said child shall die or become emancipated prior to her twenty-first birthday.

Anything to the foregoing to the contrary notwithstanding, if the husband, having reached the age of sixty-five years, shall be retired from his then employment, the husband will so long as he shall thereafter live, pay to the wife, as and for her maintenance and support one-third (1/3) of the husband's net annual income (as hereinafter defined), provided, however, that such payment shall cease if the wife, having been divorced, shall remarry. * * *

\* \* \* \* \* \* \*

NINTH: The parties hereto agree that the husband will by his Last Will and Testament devise and bequeath one-half of his net taxable estate to trustees to hold the same in trust and pay the income therefrom to the wife for her life and, upon her death, to pay over the principal thereof to the said child, or if she shall have predeceased her mother leaving issue her mother surviving, to such issue in equal shares per stirpes and not per capita or, if she shall have predeceased her mother leaving no issue her mother surviving, to the heirs at law or next of kin of the husband who would inherit in intestacy.

TENTH: The husband represents that he is the owner of * * * [life insurance policies in the total sum of $22,500], of which policies the wife is the currently designated beneficiary. The husband hereby covenants and agrees to maintain the said policies in full force and effect and to pay all premiums and other charges requisite to their validity. He further covenants and agrees to take on or before February 1, 1960 any and all steps to have the beneficiaries of said policies irrevocably designated as the wife, as long as she shall live and not have remarried and, in the event of either the death or the remarriage of the wife, the said Alicia S. Fenton, and to notify the wife of the action so taken. * * *

\* \* \* \* \* \* \*

THIRTEENTH: Each party hereto hereby waives, releases and relinquishes to the other party and to his or her heirs, distributees, executors, administrators and assigns, any and all claims or rights which may exist or hereafter arise by reason of the marriage between the parties hereto, with respect to any property, whether real, personal or mixed, belonging to such other party, except as in this agreement provided, and, without limiting the foregoing, each party hereto, subject to and except as otherwise provided for by this agreement, hereby waives and releases to the other party and to his or her heirs, distributees, executors, administrators and assigns, all right to share in any of the property or estate of such other party which has arisen or may hereafter arise by operation of law or otherwise, and hereby specifically, but not by way of limitation, waives and releases all rights of dower or curtesy, and all right to share in the estate of the other party under the intestacy laws of any jurisdiction and all right of election to take against any last will and testament of such other party, whether executed prior to or subsequent to the execution of this agreement, and all right to secure administration of the estate of such other party.

\* \* \* \* \* \* \*

FIFTEENTH: The parties hereto mutually covenant and agree that, in the event that an action for divorce is instituted at any time hereafter by either party against the other in any state or country, they shall be bound by all of the terms of this agreement and that this agreement shall not be merged in any

decree or judgment that may be granted in such action but shall survive the same and shall be forever binding and conclusive upon the parties. Nothing in this Paragraph FIFTEENTH shall be construed to prevent the decree or judgment in any such action from incorporating in full or in substance the terms of this agreement.

SIXTEENTH: This agreement shall continue in full force and effect and shall be binding upon the parties hereto, their heirs, executors, administrators and assigns, whether the marriage between them continues or whether such marriage be hereafter dissolved by decree of divorce.

\*　　\*　　\*　　\*　　\*　　\*　　\*

TWENTY-FIRST: No modification of this agreement shall be valid unless in writing and signed and acknowledged by the parties hereto.

Under the agreement, Catherine transferred no specific property to Robert other than her release of marital rights (including her right to support). On January 7, 1960, the nearest ages of Robert and Catherine were 49 and 46, respectively. Robert's assets on January 7, 1960, had an aggregate value of between $200,000 and $250,000. Throughout all years relevant to these proceedings Robert and Catherine resided in and were domiciled in New York State.

On April 7, 1960, Robert filed a divorce petition with the First Civil Court of the District of Bravos, State of Chihuahua, Republic of Mexico (Chihuahua court). Robert and Catherine were divorced by decree dated April 14, 1960, issued by the Chihuahua court.

Robert's divorce petition prayed that the agreement "be incorporated by reference in this judgment the same as if it had been reproduced in toto so that the same may survive in all its legal effects this judgment without being part of the same," and the Chihuahua court decreed:

THIRD:—That the agreement executed by the parties on January 7, 1960 in the City of New York, New York, United States of America, is approved and incorporated herewith by reference in this decree the same as if it had been reproduced in toto so that same may survive this judgment in all its legal effects without being part of the same. \* \* \*

On December 15, 1960, Catherine wrote Robert, in part, as follows:

My attorneys \* \* \* tell me that they are now of the opinion that the term "net taxable estate" as used in Article NINTH of that agreement is susceptible of an interpretation that would not carry out what I know to have been and to be still your and my intention—namely, that upon your death one-half of what you leave should be held in trust for my benefit if I survive you or, if I have

died before you, should go to Alicia. My attorneys tell me that it is possible that you could die leaving a substantial estate arranged in such a way that no tax would be payable, in which event Article NINTH could be construed to leave me and Alicia nothing. I know you never intended any such result.

* * * my attorneys * * * suggest the following definition:

The term "net taxable estate" as used in Article NINTH shall mean the gross estate of the husband reduced by the aggregate amount of those claims, expenses and debts (but not including any claim, expense or debt arising from this AGREEMENT) which are properly allowable as deductions for Federal estate tax purposes under section 2053 of the Internal Revenue Code of 1954, as amended, whether or not such claims, expenses or debts are claimed or allowed for Federal estate tax purposes. The term "gross estate" as used in the preceding sentence shall mean gross estate as defined in section 2031 of the Internal Revenue Code of 1954, as amended. The amount which, pursuant to the provisions of said Article NINTH, is to be devised and bequeathed by the husband to the trustees is intended by the parties to be one-half of the net taxable estate (as herein defined) and, to the extent that it gives rise to federal or state estate taxes, to bear its proportionate share of any such taxes.

On December 27, 1960, Robert signed Catherine's December 15, 1960, letter thereby agreeing, "The foregoing embodies my understanding and intention."

Robert's last will and testament was admitted to probate on December 23, 1971, by the Surrogate's Court, County of Nassau, State of New York. Article Third of such will reads as follows:

THIRD: Under date of January 7, 1960 I entered into a Separation Agreement with my former wife, CATHERINE S. FENTON. Article NINTH of said Agreement provides that I shall devise and bequeath one-half of my net taxable estate for the benefit of my said former wife and my daughter, ALICIA FENTON PETERS, as more fully set forth in said Article. Accordingly, if either my said former wife or my said daughter or any issue of my said daughter survives me, I hereby provide as follows:

A. If my said former wife, CATHERINE S. FENTON, survives me, I give, devise and bequeath to my Trustee hereinafter named an amount equal to one-half of my net taxable estate, IN TRUST, NEVERTHELESS, for the following uses and purposes:

(1) My Trustee shall manage, invest and reinvest the same as a separate trust, shall collect the income therefrom and, after paying all proper charges and expenses of the administration, care and protection of the trust, shall pay or apply the net income therefrom, not less often than quarterly, to or for the benefit of said CATHERINE S. FENTON during her life.

(2) Upon the death of said CATHERINE S. FENTON the trust created hereby shall terminate and I give, devise and bequeath the then principal of the trust to my said daughter, ALICIA FENTON PETERS, if she shall be then living, or, if not, to the then living issue of my said daughter, *per stirpes*, or, if none, to those persons who would have been entitled to receive such property under the laws of the State of New York existing at the time of my death, in the proportions specified by such laws, if I had died possessed only of such property and if I had died intestate and a resident of the State of New York.

B. If said CATHERINE S. FENTON does not survive me but my said daughter, ALICIA FENTON PETERS, or issue of my said daughter survives me, I give, devise and bequeath an amount equal to one-half of my net taxable estate to my said daughter, if she survives me, or, if not, to the issue of my said daughter surviving me, *per stirpes*.

The term "net taxable estate" as used in this Article shall mean my gross estate as defined in Section 2031 of the Internal Revenue Code of 1954, as amended, reduced by the aggregate amount of those claims, expenses and debts (but not including any claim, expense, or debt arising from the Separation Agreement between my former wife, CATHERINE S. FENTON, and me dated January 7, 1960) which are properly allowable as deductions for Federal estate tax purposes under Section 2053 of the Internal Revenue Code of 1954, as amended, whether or not such claims, expenses, or debts are claimed or allowed for Federal estate tax purposes.

Catherine, who never remarried, survived Robert and her nearest age at his death was 58.

On the estate tax return filed with respect to Robert's estate, petitioner claimed a deduction in the amount of $189,152.69 for "debts of the decedent." Of such amount, $184,550.29 represented Catherine's claims against Robert's estate computed as follows:

Claims for proceeds of life insurance
under article Tenth of the agreement .............. $22,584.40
Claims for life estate in trust established
pursuant to article Ninth of the agreement ....... 161,965.89
184,550.29

The value of Catherine's claim under article Ninth of the agreement was computed as follows:

Gross estate ...............................................$584,677.42
Less: Administration expenses
      per Schedule J .......................................36,151.03
    Debts of decedent per
      Schedule K, items 1–22 ........................... 4,602.40
Adjusted gross estate ...................................... 543,923.99
½ adjusted gross estate ................................... 271,961.99
Less: Trust's share of total Federal
    and N.Y. estate taxes ...................................26,514.50
                                             245,447.49
Actuarial factor for life estate
of woman, nearest age 58 ............................... × .65988
Value of life estate ......................................... 161,965.89

In his statutory notice, respondent determined that Catherine's claims against the estate were deductible only to the extent of $34,518.41, the value of Catherine's postponed support rights on January 7, 1960, computed as follows:

(i)     Annual support rights (as of date
       of separation agreement) ...........................$9,000.00
(ii)    Less: Contract payment ............................... 6,100.00
(iii)   Excess ................................................... 2,900.00
(iv)   Multiply: Annuity factor for joint lives .......... 11.9029
(v)    Value of postponed support rights ................34,518.41

The parties have stipulated that respondent has correctly determined the January 7, 1960, value of the postponed support rights to be $34,518.41.

The factor necessary to compute the value of Catherine's claim is based on Table Ln with interest at 6 percent. The present worth of the right to receive the income for life from $1 for a female aged 58 is $0.65988.

The factors necessary to compute the value of the postponed support rights are based on U.S. Life Tables 38 and the American Remarriage Table, and interest at 3½ percent. The present worth of an annuity of $1 per annum payable until the first to occur of (a) the death of a male aged 49 or (b) the death or remarriage of a female aged 46, just divorced, is $11.9029. The present worth of $1 payable on the death of a male aged 49 provided a female aged 46, just divorced, survives unremarried

is $0.28002. The present worth of the right to receive the income from $1 for such time as a female aged 46 survives a male aged 49 is $0.11637.

## OPINION

Respondent contends that Catherine's claims against Robert's estate are "founded on a promise or agreement" so that section 2053(c)(1)(A)[2] applies to limit petitioner's section 2053(a) deduction for such claim "to the extent that they were contracted bona fide and for an adequate and full consideration in money or money's worth."[3] Petitioner asserts that Catherine's claim was founded on the divorce decree, and not the agreement, but that, in any event, the full amount of Catherine's claim was contracted bona fide and for an adequate and full consideration in money or money's worth so that the claimed deduction is allowable in full.

The agreement itself as well as the facts and circumstances surrounding its execution and amendment do not support petitioner's contention that Catherine's claims were "founded" on the Chihuahua divorce decree. The Chihuahua court did not expressly order performance of the agreement. Robert's will refers to his obligations under article Ninth of the agreement, but it makes no reference at all to the Chihuahua divorce decree. Moreover, his will defines "net taxable estate" in accordance with the December 27, 1960, amendment to the agreement although there is no evidence that such amendment was ever approved by the Chihuahua court or that the court was even notified of such amendment. Although we agree that the December 27, 1960, amendment accurately expresses the parties intentions as of January 7, 1960, we believe that Catherine and Robert would have sought the Chihuahua court's approval of

---

[2](c) LIMITATIONS.—

(1) LIMITATIONS APPLICABLE TO SUBSECTIONS (a) AND (b).—

(A) Consideration for claims.—The deduction allowed by this section in the case of claims against the estate, unpaid mortgages, or any indebtedness shall, when founded on a promise or agreement, be limited to the extent that they were contracted bona fide and for an adequate and full consideration in money or money's worth; * * *

[3]Sec. 2043(b) provides:

(b) MARITAL RIGHTS NOT TREATED AS CONSIDERATION.— For purposes of this chapter, a relinquishment or promised relinquishment of dower or curtesy, or of a statutory estate created in lieu of dower or curtesy, or of other marital rights in the decedent's property or estate, shall not be considered to any extent a consideration "in money or money's worth."

such amendment if they had relied in any real sense upon the Chihuahua court to interpret and enforce the agreement.

The agreement contained the following provisions: (1) No modification of the agreement would be valid "unless in writing and signed and acknowledged by the parties hereto" (article Twenty-First); (2) in the event of a subsequent divorce action the parties agreed to be bound by the terms of the agreement (article Fifteenth); (3) the agreement would survive any subsequent decree or judgment and should "be forever binding and conclusive upon the parties" (article Fifteenth); and (4) the agreement should continue in full force and effect whether the marriage between the parties continued or whether it was subsequently dissolved (article Sixteenth). The inclusion of these provisions in the agreement is in complete accord with our holding that Catherine's claims were "founded on the Agreement, and not the divorce decree." *Gray v. United States*, 541 F.2d 228, 232 (9th Cir. 1976). Accordingly, we conclude that Catherine and Robert looked to the agreement, not the divorce decree, as the "operative fact" creating Catherine's claims against Robert's estate. *Harris v. Commissioner*, 340 U.S. 106 (1950).

Moreover, the divorce decree is not the "operative fact" under the rationale of *Estate of Bowers v. Commissioner*, 23 T.C. 911 (1955), because the Chihuahua court was not free to disregard the terms of the agreement. In *Bowers*, the taxpayer and his wife entered into a property settlement in 1932 under which the taxpayer agreed to carry life insurance on his life with the wife as beneficiary if she were living and unmarried upon his death. The wife subsequently obtained a California divorce decree which approved and incorporated the property settlement agreement. We held[4] that the taxpayer's obligation to carry life insurance was an indebtedness "founded" upon the property settlement agreement stating (23 T.C. at 922):

> Where the divorce court had no power to modify the agreement unless it held the agreement invalid and rescinded, it was *not* "free" to disregard the provisions of that agreement; and, therefore, the holdings in *Commissioner v.*

---

[4]Petitioner argues that the language in *Estate of Bowers v. Commissioner*, 23 T.C. 911 (1955), concerning the power of the California court to disregard the terms of the property settlement was dicta. We disagree. A close reading of *Bowers* confirms that, at the very least, the California court's lack of discretion to disregard the terms of the property agreement was an independent ground for our holding that the wife's claim in *Bowers* was "founded" on the agreement, not the decree.

*Maresi* [156 F.2d 929 (2d Cir. 1946)] and *Estate of Myles C. Watson*, [216 F.2d 941 (2d Cir. 1954)] both *supra*, do not apply. Even in *McMurtry v. Commissioner*, 203 F.2d 659, 662, reversing in part *George G. McMurtry*, 16 T.C. 168, on the ground that two of the "transfers" involved in that case were not "founded upon a promise or agreement" but upon a divorce decree, the holding was based upon the assumption that the divorce court had within "its discretion to prescribe some different property settlement." The divorce court had no such discretion in the instant case. * * * Also, where the sole effect of approval and incorporation by reference of the agreement in the decree is to render its validity res judicata in a subsequent action based upon it, the decree under no theory can be said to be "the legal transaction which creates the obligation." *Commissioner v. Maresi, supra.* A court decree declining to rescind a contract does not create the parties' obligations under the contract. In the instant case the agreement was the "operative fact" creating the obligation and was the source of the parties' rights. * * *

Petitioner contends that the *Bowers* test incorrectly relies upon the discretion of the divorce court as a relevant factor in determining whether a claim is "founded" on the divorce decree or the prior agreement. Petitioner argues that the *Bowers* test is based on a misconception as to the powers of divorce courts because every divorce court, petitioner contends, has the power to refuse to approve and order performance of an agreement that it considers inequitable. Although this may be so, we believe there is a valid distinction between the discretion to refuse to incorporate an agreement and the discretion of the court to impose *its own settlement terms*. In the latter case, the divorce court may determine the *amount* of the settlement, but in the former case, the parties determine the amount so that the divorce court must either approve such amount or award no payment at all. Such conclusion is supported by *Harris v. Commissioner, supra,* where the Supreme Court stated (340 U.S. at 110) that an arrangement was not founded on a promise or agreement where—

It would be wholly conditional upon the entry of the decree; the divorce court might or might not accept the provisions of the arrangement as the measure of the respective obligations; *it might indeed add to or subtract from them.* The decree, not the arrangement submitted to the court, would fix the rights and obligations of the parties. That was the theory of *Commissioner of Internal Revenue v. Maresi,* 2 Cir., 156 F. 2d 929, and we think it sound. [Emphasis supplied.]

*Bowers* also relied upon *McMurtry v. Commissioner,* 203 F.2d 659 (1st Cir. 1953), revg. in part 16 T.C. 168 (1951), in which the court stated (203 F.2d at 662):

We read *Harris v. Commissioner* [340 U.S. 106 (1950)] more broadly as supporting the proposition that, to the extent that the statute does not explicitly command adherence to meaningless formalities, all transfers agreed upon in contemplation of divorce and executed after approval by a divorce court having jurisdiction to give such sanction *or in its discretion to prescribe some different property settlement,* should be exempt from the gift tax. * * * [Emphasis supplied.]

The Second Circuit, where an appeal of the instant case would lie, quoted the *McMurtry* language with approval in *Commissioner v. Estate of Watson,* 216 F.2d 941, 944 (2d Cir. 1954). In support of its argument that a claim is founded upon the decree in any case where parties are subsequently divorced and their property settlement agreement is incorporated by reference in the divorce decree, petitioners rely upon the following language in *Estate of Watson* (216 F.2d at 945):

The fact of divorce and the adoption by the decree of the financial terms agreed on by the parties governing the ending of their marital relationship should be taken, we think, as satisfying the purpose of the statute to ensure against colorable deductions. * * *

However, since this language came *after* the court had approved the *McMurtry* view of *Harris* and since the court was dealing with a *Nevada* decree (in which the court could have disregarded the terms of the parties' agreement), we believe the court assumed the divorce and "adoption" to have been made by a court with discretion to disregard the parties' settlement terms. Moreover, in *Commissioner v. Maresi,* 156 F.2d 929, 930–931 (2d Cir. 1946), the Second Circuit had adopted a test based on the discretion of the divorce court to disregard the parties' settlement terms so that if it intended to reject such a test in *Estate of Watson* we believe it would have spoken more explicitly.

Our conclusion that the *Bowers* test rests upon a valid distinction with respect to the powers of divorce courts is also supported by *Gray v. United States, supra,* in which the Ninth Circuit Court of Appeals held, citing *Bowers,* that a claim was founded on the property agreement rather than the California divorce decree because the California divorce court had no power to modify or alter the terms of the property settlement agreement.

Petitioner has not argued that the Chihuahua court had the power to disregard the terms of the agreement. Accordingly, we

hold that Catherine's claim was "founded on a promise or agreement" so that section 2053(c)(1)(A) applies with the result that petitioner's deduction for Catherine's claim is limited to the extent that it was "contracted bona fide and for an adequate and full consideration in money or money's worth."

Petitioner argues that section 2516[5] should be applied in order to determine for estate tax purposes whether Catherine gave adequate and full consideration in money or money's worth for her claim against Robert's estate. We have not considered such argument, however, because we find that the relinquishment of Catherine's postponed support rights represented adequate and full consideration for her claim against Robert's estate.

Respondent concedes that postponed support rights are consideration in money or money's worth for purposes of sections 2053(c)(1)(A) and 2043 but he argues that in the instant case Catherine's relinquishment of her postponed support rights was not "adequate and full consideration" for her claim against Robert's estate so that petitioner's deduction for Catherine's claims should be limited to the value of her postponed support rights on January 7, 1960. In order to determine whether the relinquishment of her postponed support rights was adequate and full consideration for Catherine's claims against Robert's estate, respondent has compared the value of such rights, as of January 7, 1960, with the value of Catherine's claims on the date of Robert's death, 11 years later. The crux of respondent's argument is, "Since the life estate was not to be set up until Robert's death it had no ascertainable value at the time the separation agreement was executed."

We find such argument fanciful and reject it. A wife who is bargaining away her right to support is engaged in hard and

---

[5]SEC. 2516. CERTAIN PROPERTY SETTLEMENTS.

Where husband and wife enter into a written agreement relative to their marital and property rights and divorce occurs within 2 years thereafter (whether or not such agreement is approved by the divorce decree), any transfers of property or interests in property made pursuant to such agreement—

(1) to either spouse in settlement of his or her marital or property rights, or

(2) to provide a reasonable allowance for the support of issue of the marriage during minority,

shall be deemed to be transfers made for a full and adequate consideration in money or money's worth.

serious negotiations and can be expected to know the worth of what she is getting in return.[6]

Section 2053(c)(1)(A) limits a deduction for claims against the estate, when founded on a promise or agreement, to the extent that they were contracted bona fide for an adequate and full consideration. Therefore, the date on which the contract (agreement) was made[7] is the proper date on which Catherine's claims against Robert's estate must be valued and compared with the value of her postponed support rights to determine if she gave adequate and full consideration for her claims against Robert's estate. Pertinent parts of Rev. Rul. 71–67, 1971–1 C.B. 271–272 provide:

the allowance of a deduction for a claim founded upon a promise or agreement is limited to the extent that the liability was contracted bona fide and for an adequate and full consideration in money or money's worth. * * *

\* \* \* \* \* \* \*

Accordingly, it is held that the release by the decedent's wife of her right to support and maintenance is "consideration in money or money's worth" as that term is used in section 2053(c)(1)(A) of the Code. Therefore, the claim for payment after the death of the decedent, to the extent that it is based on such release, is deductible by the estate under section 2053(a)(3) of the Code as a claim based upon an adequate and full consideration in money or money's worth to the extent of the value of the postponed support rights.

The question whether the amount of the claim is in excess of the wife's reasonable support rights is a matter for determination by the District Director after consideration of the facts and circumstances of the case. *Elements to be considered are the amount of the husband's annual income*, the extent of his assets, *the relative ages of the parties and, where applicable, the probability of the wife's remarriage*, etc. See *Commissioner v. Estate of Donald M. Nelson*, 396 F.2d 519 (1968).

It is to be noted that a wife's support rights are generally limited to the period of the joint lives of herself and her husband or until her earlier remarriage. Thus, where, as here, the support payments are to continue beyond the period of their joint lives, a determination must be made whether the lifetime payments were less than that to which she would have been entitled to receive as support under state law. It is the value of the postponed support rights to which the deduction allowable under section 2053(a)(3) of the Code is

---

[6]We note that the parties were considering possible future eventualities when they provided for changes by article Eighth of the agreement if the husband should retire at age 65; about 7 years after the agreement date.

[7]For this purpose, we believe the date on which the claim was contracted was the date on which the agreement was executed rather than the date on which it was amended to clarify Catherine's rights. The language in the unamended agreement was ambiguous but it was certainly susceptible of an interpretation identical to that adopted by the amended agreement, and we believe the amendment accurately expresses the agreement which the parties intended to execute on Jan. 7, 1960.

limited (unless the value of the widow's claim is less than the value of the postponed support rights). *For Federal estate tax purposes, the value of the portion of the wife's support rights which she agreed to have postponed is ascertained as of the date of the separation agreement.* * * *

[Emphasis supplied.]

Thus, the Revenue Ruling provides that the date of the agreement is the governing date for valuing the consideration given by each party thereto. How else is it possible to read the emphasized elements urged for the consideration of the District Director? The husband's annual income, the relative ages of the parties, and the probability of the wife's remarriage become mere meaningless words at the time of the husband's death.

Our view of the proper time for valuation is supported by *In Re Estate of Hartshorne v. Commissioner*, 402 F.2d 592, 596 (2d Cir. 1968), affg. 48 T.C. 882 (1967), where it is stated:

Since the trust was not to be set up until decedent died, the trust may have had no ascertainable value in 1942. This does not mean, however, that the *promise* to establish the trust had no value. Indeed, the fact that the promise was incorporated into a court-approved divorce decree would seem to indicate that the promise was not altogether without value.

While the trust to be set up in the future may not have had any ascertainable present value in 1942, and while it may not have been possible to ascertain the precise value of Mary's life estate in 1942, it is enough for us to be able to say that the promise was not wholly worthless.

The promise had large potential worth. Even in 1942 the decedent's estate was worth over $340,000 and could be expected to increase. * * *

Since the Tax Court found (and petitioners concede) that Mary gave no consideration for the children's rights, and since *plainly decedent's promise was valuable to some extent at the time of the exchange*, there was no "adequate and full consideration" for the promise. * * *

[Emphasis supplied; fn. ref. omitted.]

Also cf. *Estate of Iversen v. Commissioner*, 65 T.C. 391, 410 (1975), revd. and remanded on other grounds 552 F.2d 977 (3d Cir. 1977).

We observe finally, that if the value of the trust were to be computed at death instead of in 1960, then the value of the wife's right to support should also be ambulatory to reflect changes in the husband's financial health. If the husband's estate increased or decreased with the passage of time then, absent the agreement, the wife's support rights would also increase or decrease, the result being that as the estate potential increased the wife has given more consideration, for under the

agreement she still gets only the same $6,100 per year, and as the estate potential decreases, her consideration shrinks.

The only method or gauge which must always be inaccurate and wrong (absent an estate of constant worth) is the method of valuing the wife's consideration at one point in time and the quid pro quo at another. This is the "hindsight" method which respondent urges upon us, and which of course was not available to the parties during the give and take of their negotiations in January 1960. We find it unrealistic and fanciful to the point of being ridiculous.

The parties have stipulated that the value of Catherine's postponed support rights on January 7, 1960, was $34,518.41, but cannot agree upon the January 7, 1960, value of the claims against Robert's estate which Catherine received under the agreement. Such claims were (1) to receive life insurance proceeds of $22,500 upon Robert's death if she survived him unmarried (life insurance claim), and (2) to receive upon Robert's death a life estate in a trust consisting of one-half of his net taxable estate (trust claim).

Since it has been stipulated that the present worth of $1 payable on the death of a male aged 49, if a female aged 46, just divorced, survives him unremarried is $0.28002, we find the January 7, 1960, value of Catherine's life insurance claim was $6,300.45 ($22,500 x $0.28002).

It is more difficult, however, to value Catherine's trust claim. The parties have stipulated that the present worth of the right to receive the income from $1 for so long as a female aged 46 survives a male aged 49 is $0.11637 and that the value of Robert's assets as of January 7, 1960, was between $200,000 and $250,000. Therefore, petitioner argues that even disregarding debts and estate taxes (which are deductible under the amended agreement in arriving at "net taxable estate"), the maximum value on January 7, 1960, of Catherine's right upon Robert's death to receive income for life from one-half of Robert's "net taxable estate" was $14,546.25 ($125,000 x $0.11637). Thus, petitioner concludes that on January 7, 1960, Catherine gave $13,671.71 more consideration than she received by surrendering postponed support rights valued at $34,518.41 for claims totaling only $20,846.70 ($6,300.45 plus $14,546.25). Respondent correctly points out that petitioner's valuation has disregarded the potential for an increase in Robert's estate after January 7, 1960,

since Catherine was entitled to income for life from one-half of Robert's net taxable estate *at his death*. While we believe that such growth potential certainly had some value, we do not believe that its value was so great that the January 7, 1960, value of Catherine's claims against Robert's estate exceeded the value of her postponed support rights. In this regard, we note that it was possible for the value of Robert's assets to decrease as well as increase between January 7, 1960, and the date of his death. Moreover, given the stipulated factor of $0.11637, the January 7, 1960, value of Catherine's trust claim would not have exceeded $28,217.96 (value of Catherine's postponed support rights, $34,518.41, less value of life insurance claim, $6,300.45), unless a substantial increase in Robert's assets between January 7, 1960, and the date of his death could be expected.[8]

In hindsight, upon Robert's death, Catherine actually received the income for life from $245,447.49, but this does not prove that such an increase was expected on January 7, 1960. Moreover, if this amount had been known on January 7, 1960 (which it was not), the value of the claims upon Robert's estate which Catherine received under the agreement would have been only slightly more than the value of her postponed support rights.

It does not follow from our holding herein that Catherine relinquished her section 2043(b) marital rights for no consideration. Aside from the rights which Catherine received in exchange for her support rights, Catherine also received the family residence (article Sixth), the personal property therein (article Fifth), and the right to a new car (article Seventh). Accordingly, we hold that petitioner is entitled to the entire claimed deduction for Catherine's claims against the estate under section 2053(a)(3) and section 2053(c)(1)(A).

*Decision will be entered under Rule 155.*

---

[8]If it were certain on Jan. 7, 1960, that one-half of Robert's "net taxable estate" would equal $242,484.83 (approximately the value of *all his gross assets* on Jan. 7, 1960), then the aggregate Jan. 7, 1960, value of Catherine's claims against Robert's estate would be computed as follows:

Value of life insurance claim ........................................ $22,500 × $0.28002 = $6,300.45
Value of right to receive income
from $242,484.83 for such time
as female aged 46 survives a male aged 49 ................ $242,484.83 × $0.11637 = $28,217.96
Total = Value of Catherine's postponed support rights = $34,518.41