# United States Tax Court

T.C. Memo. 2023-25

ESTATE OF RICHARD D. SPIZZIRRI, DECEASED, JOHN J.
MCATEE, JR., PERSONAL REPRESENTATIVE,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 19124-19.                    Filed February 28, 2023.

————

*James R. Walker*, for petitioner.

*Ray Malone Camp*, *Bryant W. Smith*, and *David W. Sorensen*, for respondent.


## MEMORANDUM FINDINGS OF FACT AND OPINION

URDA, *Judge*:  Richard D. Spizzirri was a well-to-do lawyer and investor who passed away in 2015.  During the last few years of his life, Mr. Spizzirri paid significant sums to one of his daughters, one of his stepdaughters, and multiple women with whom he was either socially or romantically connected.  At the time of his death, Mr. Spizzirri was married to his fourth wife, and his estate, i.e., the Estate of Richard D. Spizzirri (Estate), later paid $1 million to each of his wife's three children pursuant to an antenuptial agreement, as modified several times during the marriage.

The parties dispute whether Mr. Spizzirri's payments over the last few years of his life constitute taxable gifts, and whether the Estate's payments to Mr. Spizzirri's stepchildren are claims against the

**[\*2]** estate deductible under section 2053(a)(3).[1]  The parties also spar over the Internal Revenue Service's (IRS) disallowance of a deduction under section 2053(a)(2) for the Estate's expenses to repair and maintain two of Mr. Spizzirri's properties.  Finally, the Estate challenges the IRS's determination of an addition to tax under section 6651(a)(1) for failure to timely file the estate tax return.  We will sustain the IRS's determinations, subject to concessions made by the Commissioner.

FINDINGS OF FACT

Trial in this case began on May 19, 2021, during the Buffalo, New York, remote trial session (via ZoomGov).  We incorporate by reference the stipulations of facts and their exhibits.  The Estate's executor lived in Florida when he timely filed the petition in this case.  At the time of his passing, Mr. Spizzirri was living in Colorado.

I.    *Background*

Mr. Spizzirri worked as a lawyer and investor focusing on the biotechnology sector.  His efforts brought him considerable wealth, part of which he used to buy properties in New York City, the Hamptons, Aspen, and Miami.

Mr. Spizzirri was married four times, with his first marriage producing four children.  His fourth and final marriage was to Holly Lueders, who had three children of her own from a previous marriage.  Mr. Spizzirri and Ms. Lueders entered into an antenuptial agreement (Prenup) on March 4, 1997 (approximately a month before they wed), which they modified five times over the following 18 years.  The parties agreed that the Prenup would be "construed in accordance with the laws of the State of New York."

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, all Rule references are to the Tax Court Rules of Practice and Procedure.  All monetary amounts are rounded to the nearest dollar.

**[\*3]**  A.  *The Prenup and Modifications*

1.  *The Prenup*

The Prenup contains general recitals of the parties' intentions and assets at the time of marriage, as well as articles that define the parties' rights with respect to distinct subjects, such as the waiver of estate rights (Article IV), property rights in the event of a dissolution of marriage (Article V), and maintenance (Article VI). The parties represent that Mr. Spizzirri brought between $24.7 million and $27.7 million in net assets to the marriage, while Ms. Lueders brought approximately $1.25 million in net assets. Among other things, the parties specify that they intended the Prenup "to fix their rights and obligations to their property and to the support of one another in the event of their separation or the legal termination of the marriage, and to fix their rights and obligations in their property after death."

a.  *Waiver of Marital Rights*

Article IV sets forth the parties' "waiver and release . . . of all rights in and to each other's estate under any rule or law . . . entitling a surviving spouse to all or any part of the estate or property of a deceased spouse or to any interest therein."

The Prenup provides that "in lieu of any other rights which may be available to her as the surviving spouse" of Mr. Spizzirri, Ms. Lueders would receive a mix of both money and rights in certain property. Specifically, the Prenup requires Mr. Spizzirri to "make and keep in effect" a will that would (1) establish a marital trust of 25% of his gross estate that would pay Ms. Lueders no less than $200,000 per year (indexed for inflation) and (2) grant Ms. Lueders the right to live in Mr. Spizzirri's Easthampton home for five years without any payment for rent or upkeep.

The Prenup also provides a mechanism for the sale of Mr. Spizzirri's Aspen house in the event of his death, with Ms. Lueders receiving 12.5% of the gross sale proceeds. The parties further agree that Mr. Spizzirri would pay for the schooling of Ms. Lueders's children from her previous marriage should she predecease him.

**[*4]**         b.         *Dissolution of Marriage*

Article V deals with a possible dissolution of marriage, which includes separation, divorce, or annulment. In that circumstance, the parties agreed to waive all rights to the separate property of the other.

The Prenup further provides that in the event of a dissolution, "in consideration of her relinquishment of any rights she has or might have at such time to maintenance or support and any claims she has or might have to equitable distribution," Ms. Lueders would receive $1 million plus $250,000 for each year they were married, not to exceed $4.5 million. The Prenup also states that Mr. Spizzirri would provide Ms. Lueders with a deed for a 12.5% interest in his Aspen house and land "as additional consideration for [Ms. Lueders's] waiver of maintenance and equitable distribution" and that, in the event of dissolution, the property would be sold and Ms. Lueders would receive payment for her interest. The Prenup clarifies that the $4.5 million cap was to be reduced by (1) any amounts paid to Ms. Lueders with respect to her 12.5% interest in the Aspen property and (2) certain $25,000 monthly payments that Mr. Spizzirri was required to pay until the entry of the divorce judgment.

c.         *Maintenance*

Article VI sets forth Mr. Spizzirri and Ms. Lueders's agreement to waive "any and all right to seek maintenance . . . spousal support, or alimony . . . except as herein expressly provided."

2.         *Modification Agreements*

Mr. Spizzirri and Ms. Lueders modified the Prenup five times from 1999 through 2009. Each of these modifications exclusively addressed Article IV, which (as discussed above) specified the property and money to be settled on Ms. Lueders in exchange for her waiver of her marital rights as Mr. Spizzirri's surviving spouse.

As relevant here, the parties entered into a modification agreement on November 3, 2005 (Third Modification), stating their "desire . . . to modify and amend the [Prenup] to provide for [Ms. Lueders] following the death of [Mr. Spizzirri]" and specifying that she would "accept the following provisions in lieu of any other rights which may be available to her as the surviving spouse." The Third Modification alters the property that Ms. Lueders would receive at Mr. Spizzirri's death. It states that Mr. Spizzirri would keep in effect a will

[*5] providing that Ms. Lueders would receive at his death (1) his interest in his New York City penthouse apartment and $6 million (or one-fifth of his gross estate) and (2) the right to reside at Mr. Spizzirri's Easthampton property for five years free of charge. The Third Modification further provides that the will would include a bequest of $1 million to each of Ms. Lueders's children.

With minor changes, these provisions remained in the following two modification agreements. The final modification in 2009 contained a change to Article V of the Prenup (addressing equitable distributions upon dissolution of marriage), which provided that the lump sum that Ms. Lueders would receive would be reduced only by Mr. Spizzirri's monthly payments before the entry of the divorce judgment. This change meant that the amount paid to Ms. Lueders for her interest in the Aspen property no longer reduced the lump-sum payment to which Ms. Lueders was entitled under the Prenup.

B. *Mr. Spizzirri's Lifestyle*

Ms. Lueders and Mr. Spizzirri were estranged for several years before his death. Mr. Spizzirri did not want for female companionship, however. He fathered two children with two different women outside of his marital bonds and purchased a Miami condominium with another lady friend, Hadria Lawner.

Over the last few years of his life, Mr. Spizzirri made large payments to multiple women. He did not issue Form W-2, Wage and Tax Statement, Form 1099-MISC, Miscellaneous Income, or any other tax report for these payments.

Some of these payments were to family: He paid one of his daughters $15,000 in 2014 and one of his stepdaughters $25,700 and $21,000 in 2014 and 2015, respectively. Mr. Spizzirri also made payments to Angela Huper, the mother of one of his sons born outside of his marriage, of $27,111, $19,175, $24,981, and $12,226 for 2011, 2012, 2013, and 2015, respectively. And he paid Hadria Lawner, with whom he purchased a condominium, $37,500, $22,714, and $30,000 during 2013, 2014, and 2015, respectively.

Mr. Spizzirri also paid assorted women with whom he had less well-defined relationships. He made payments of (1) $59,661, $16,600, and $13,400 during 2011, 2012, and 2013, respectively, to Zsusanna Pacziga, (2) $24,100 and $25,052 during 2011 and 2012 to Eve Seiler, (3) $22,800, $50,750, and $26,600 during 2013, 2014, and 2015,

[*6] respectively, to or on behalf of Tatiana Mardovina, (4) $42,900 and $30,455 during 2013 and 2014, respectively, to Tiffany Dazey Preston, and (5) $58,550, $34,400, and $7,350 during 2012, 2013, and 2014, respectively, to Vivien Levine.

### C. *Will and Codicils*

Although the Prenup and its modifications each provided that Mr. Spizzirri would keep in effect a will that reflected the parties' agreements in Article IV, he did not do so. Mr. Spizzirri had made a will in 1979, long before he married Ms. Lueders, which, by and large, bequeathed his estate to his children.

Beginning in 2014, Mr. Spizzirri executed four codicils to his will. The first three codicils specified the inheritance rights of Mr. Spizzirri's sons who had recently been born outside of his marriage. The last codicil related to the condominium he owned with Hadria Lawner, providing that his estate would pay off the mortgage and transfer his interest to her.

## II. *Probate*

Mr. Spizzirri passed away on May 12, 2015, in Pitkin County, Colorado. The Pitkin County District Court later admitted Mr. Spizzirri's will and codicils to probate. Ms. Lueders filed various claims, which sought payments of mortgages, payments to her children, and certain real and personal property, among other things. Ms. Lueders and the Estate ultimately reached a binding settlement of her claims on November 22, 2016, which was thereafter approved by the Pitkin County District Court on December 17, 2016.

Ms. Lueders's three children also filed claims, seeking to be paid under the terms of the Third Modification Agreement. The Estate thereafter made $1 million payments to each of Ms. Lueders's three children, plus interest payments required by Colorado law. The Estate reported these payments to the IRS on Forms 1099-MISC.

## III. *The Estate Tax Return and Notice of Deficiency*

The Estate's federal estate tax return was due on February 10, 2016. On February 19, 2016, the Estate remitted an estate tax payment of $11,800,000 along with a request for a six-month extension to file the return, which was granted, extending the deadline to August 12, 2016.

**[*7]**  In July 2016 the Estate's tax adviser sent a request via letter to the IRS for a second extension of the filing deadline because of the ongoing probate litigation with Ms. Lueders.  In a letter dated August 18, 2016, the IRS informed the Estate that a second extension could not be granted as a matter of law.

On November 29, 2016, shortly after the settlement of the probate litigation, the Estate filed Form 706, United States Estate (and Generation Skipping Transfer) Tax Return.  The return showed a gross estate exceeding $81 million, a taxable estate of $30,805,768, and tax due of $10,150,307.

The Estate reported on the return zero dollars in adjusted taxable gifts.  It deducted as claims against the estate both the $3 million in payments to Ms. Lueders's children and the $623,255 appraised value of Ms. Lueders's right to reside in the Easthampton property for five years.  The Estate further claimed administration expense deductions, including emergency repairs of $22,034 for the New York City apartment and $314,890 for two decks at the Aspen property.  The Estate also deducted $455,166 for five years of estimated "property maintenance" expenses related to Ms. Lueders's right to reside in the Hamptons beach house for five years.

After processing this return, the IRS issued a refund of $1,649,693 in light of the payment previously remitted.  The IRS thereafter began an examination into the proper estate tax liability.

The IRS issued a notice of deficiency determining a deficiency in estate tax of $2,251,189 as well as an addition to tax under section 6651(a)(1) of $450,238 for failure to timely file.  The notice increased Mr. Spizzirri's lifetime adjusted taxable gifts from zero to $193,441.  The notice disallowed the deductions claimed for the payments to Ms. Lueders's children and her right to reside in the Easthampton property.  It likewise disallowed the administration expense deductions for the emergency repairs to the Aspen property and the maintenance expenses for the Easthampton property during Ms. Lueders's five-year right to reside there.

OPINION

I.    *Burden of Proof*

Generally, a taxpayer bears the burden of proving by a preponderance of the evidence that the determinations of the

**[\*8]** Commissioner in a notice of deficiency are incorrect. *See* Rule 142(a)(1); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Section 7491(a) shifts the burden to the Commissioner, however, with respect to a factual issue relevant to a taxpayer's liability where the taxpayer, inter alia, provides credible evidence.

"Credible evidence is the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness)." *Higbee v. Commissioner*, 116 T.C. 438, 442 (2001) (quoting H.R. Rep. No. 105-599, at 240–41 (1998) (Conf. Rep.), *as reprinted in* 1998-3 C.B. 747, 994–95). "[W]e are not compelled to believe evidence that seems improbable or to accept as true uncorroborated, although uncontradicted, evidence by interested witnesses." *See, e.g.*, *Estate of Erickson v. Commissioner*, T.C. Memo. 2007-107, 2007 WL 1364407, at \*6. As we will explain, the Estate's evidence does not rise to the level of credible evidence, and the burden accordingly remains on the Estate.[2]

## II.  *Gift Tax*

### A.  *Legal Framework*

The gift tax imposes an excise tax on the transfer of property by gift during the donor's lifetime. *See* I.R.C. § 2501(a)(1). The gift tax is imposed whether the gift is made directly or indirectly, whether it is real or personal property, and whether it is tangible or intangible. I.R.C. § 2511(a); *see Dickman v. Commissioner*, 465 U.S. 330, 334 (1984) ("The language of [sections 2501(a)(1) and 2511(a)] is clear and admits of but one reasonable interpretation: transfers of property by gift, by whatever means effected, are subject to the federal gift tax. . . . [T]he gift tax was designed to encompass all transfers of property . . . .").[3]

---

[2] Section 7491(c) places the burden of production on the Commissioner with respect to the liability of any individual for any penalty or addition to tax. *Higbee*, 116 T.C. at 446. The provision has no application here as an estate is not an individual. *Estate of Jackson v. Commissioner*, T.C. Memo. 2021-48, at \*248; *Estate of Ramirez v. Commissioner*, T.C. Memo. 2018-196, at \*32.

[3] Although the donor is primarily responsible for paying the gift tax, *see* I.R.C. § 2502(c), if the donor dies before paying the gift tax, the personal representative of the donor's estate is responsible for paying the tax out of the estate, as a debt due to the United States from the estate, *see* Treas. Reg. § 25.2502-2.

**[\*9]** "Donative intent on the part of the transferor is not an essential element in the application of the gift tax to the transfer." Treas. Reg. § 25.2511-1(g)(1). "The application of the tax is based on the objective facts of the transfer and the circumstances under which it is made, rather than on the subjective motives of the donor." *Id.*

The tax is imposed on "taxable gifts," which is defined as the total amount of gifts made during the calendar year less specified deductions. I.R.C. § 2503(a). Section 2503(b) provides an annual exclusion from gift tax. As relevant here, the annual exclusion was $13,000 during 2011 and 2012 and $14,000 for 2013 through 2015. *See What's New – Estate and Gift Tax*, IRS, https://www.irs.gov/businesses/small-businesses-self-employed/whats-new-estate-and-gift-tax (last updated Dec. 20, 2022).

B.    *Mr. Spizzirri's Largesse From 2011 Through 2015*

The Estate failed to meet its burden to prove that Mr. Spizzirri's significant payments to various family members and friends from 2011 through 2015 were not gifts subject to the gift tax. From 2011 through 2015, Mr. Spizzirri paid sizable sums to one of his daughters, one of his stepdaughters, and seven women with whom he had social or romantic relationships.

The Estate argues that the payments to these individuals were not taxable gifts but rather payments for care and companionship services during the last years of his life. In support, the Estate offered the testimony of one of Mr. Spizzirri's daughters, his executor, and one of his lawyers.

We first note that the Estate's failure to call the recipients themselves (aside from Mr. Spizzirri's daughter) could give rise to an adverse inference that, had they been called, their testimony would not have supported the Estate's contentions. *See Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C. 1158, 1165 (1946), *aff'd*, 162 F.2d 513 (10th Cir. 1947).

Even if we lay aside such an adverse inference, the Estate has failed to establish that Mr. Spizzirri's payments were not gifts. Mr. Spizzirri paid the amounts at issue by checks that contain no indication that they were meant as compensation. Mr. Spizzirri did not issue or file any Forms 1099 or W-2 related to these payments, nor did he report these payments on his personal income tax returns.

**[\*10]** The trial witnesses did not address Mr. Spizzirri's payments to six of the nine recipients at issue, much less establish that the payments to them were not gifts.[4] As to the remaining three recipients, the trial testimony reflected that they helped Mr. Spizzirri in various ways during the last few years of his life from running errands to staying by his bedside when he was in the hospital.

The testimony did not resolve, however, whether Mr. Spizzirri's payments to them were anything other than gifts to express his appreciation to loyal and steadfast friends. As Mr. Spizzirri's lawyer put it: "I knew him to say these women were his friends. And that's why he was generous with them." For her part, Mr. Spizzirri's daughter could shed a little more light on her father's affairs, testifying that one of the women who helped him "sort of did everything—like a secretarial—wife—I don't know."

In short, the documentary and testimonial evidence fails to clear up the murky relationship between Mr. Spizzirri and the recipients of his payments, and thus is insufficient to establish that the payments at issue were not gifts.[5]

---

[4] On brief the Estate concedes that the payments to Mr. Spizzirri's daughter were gifts but argues that the payments to or on behalf of "Angela Huper were support for [Mr. Spizzirri's] child and not gifts." The Estate presented no testimony on this point, and the memorandum lines and recipients of the checks contradict this assertion.

[5] At trial, the Estate sought to introduce a 2019 IRS Office of Chief Counsel memorandum obtained through a Freedom of Information Act request, as Exhibit 502-P. The Estate argued that this memorandum is relevant both to (1) understanding the amounts that the IRS considered (or chose not to consider) when determining Mr. Spizzirri's gift tax liability in the notice of deficiency and (2) evaluating the IRS's compliance with section 6751(b) in asserting the late-filing penalty. Assuming arguendo that neither the attorney-client privilege nor the work product doctrine applies, we nonetheless decline to admit Exhibit 502-P on relevance grounds. The memorandum has no bearing on our decision as to the correctness of the gift tax liability as we "will not look behind a deficiency notice to examine the evidence used or the propriety of [the Commissioner's] motives or of the administrative policy or procedure involved in making his determinations." *Greenberg's Express, Inc. v. Commissioner*, 62 T.C. 324, 327–28 (1974). As to section 6751(b), the approval requirement in section 6751(b)(1) does not apply to any addition to tax under section 6651, as in this case. I.R.C. § 6751(b)(2)(A).

**[\*11]** III.    *Estate Tax*

   A.    *Overview*

The estate tax imposes a tax "on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States." I.R.C. § 2001(a).  A decedent's gross estate includes "the value at the time of his death of all property . . . wherever situated." I.R.C. § 2031(a). For purposes of determining the taxable estate, the value of the gross estate is reduced by permissible deductions, including claims against the estate that are allowable by applicable state law and administration expenses.  I.R.C. §§ 2051, 2053(a)(2) and (3).

   B.    *Claims Against the Estate*

      1.    *Legal Framework*

The deduction for claims against the estate is subject to section 2053(c)(1)(A), which provides that "the deduction allowed . . . in the case of claims against the estate . . . shall, when founded on a promise or agreement, be limited to the extent that they were contracted bona fide and for an adequate and full consideration in money or money's worth."  The "purpose of this section . . . was to prevent deductions, under the guise of claims, of what were in reality gifts or testamentary distributions." *Carney v. Benz*, 90 F.2d 747, 749 (1st Cir. 1937); *see also Estate of Pollard v. Commissioner*, 52 T.C. 741, 744 (1969).

The Estate must establish that "the promise resulting in the claim on the estate 'was contracted for in good faith for value which augmented the decedent's estate.'" *See Estate of Kosow v. Commissioner*, 45 F.3d 1524, 1531 (11th Cir. 1995) (quoting *Leopold v. United States*, 510 F.2d 617, 624 (9th Cir. 1975)), *vacating and remanding* T.C. Memo. 1992-539; *see also Estate of Tiffany v. Commissioner*, 47 T.C. 491, 497 (1967).  "The 'bona fide' and 'consideration' elements in section 2053(c)(1)(A) are related but separate requirements, and if either is missing the deduction fails under this section." *Estate of Cole v. Commissioner*, T.C. Memo. 1989-623, 1989 WL 138921, *rev'd on other grounds sub nom. Devore v. Commissioner*, 963 F.2d 280 (9th Cir. 1992).

**[\*12]**                    a.    *Bona Fide*

The bona fide requirement generally prohibits a deduction "to the extent it is founded on a transfer that is essentially donative in character (a mere cloak for a gift or bequest)." Treas. Reg. § 20.2053-1(b)(2)(i).  "[T]ransactions among family members are subject to particular scrutiny, even when they apparently are supported by monetary consideration, because that is the context in which a testator is most likely to be making a bequest rather than repaying a real contractual obligation." *Estate of Huntington v. Commissioner*, 16 F.3d 462, 466 (1st Cir. 1994), *aff'g* 100 T.C. 313 (1993); *see also Estate of Tiffany*, 47 T.C. at 499.

Treasury Regulation § 20.2053-1(b)(2)(ii) supplies guidance on this front, setting forth factors to evaluate whether a claim involving family members is bona fide.  Among other "[f]actors indicative (but not necessarily determinative) of the bona fide nature of a claim," the Treasury Regulation considers whether (1) "[t]he transaction underlying the claim or expense occurs in the ordinary course of business, is negotiated at arm's length, and is free from donative intent," (2) "[t]he nature of the claim or expense is not related to an expectation or claim of inheritance," (3) "[p]erformance by the claimant is pursuant to the terms of an agreement between the decedent and the family member, . . . and the performance and the agreement can be substantiated," and (4) all amounts paid in satisfaction of the claim "are reported by each party for Federal income . . . tax purposes . . . in a manner that is consistent with the reported nature of the claim." *Id.*

b.    *Consideration*

In addition to being contracted bona fide, section 2053(c)(1)(A) requires that claims against the estate be contracted for "an adequate and full consideration in money or money's worth" to be deductible. Satisfaction of this requirement "may not be predicated solely on the fact that the contract is enforceable under State law," *Estate of Glover v. Commissioner*, T.C. Memo. 2002-186, 2002 WL 1774231, at \*14, but instead necessitates "a higher standard of consideration," *Estate of Carli v. Commissioner*, 84 T.C. 649, 658 (1985).

"In good tax code fashion, there is a further provision, § 2043(b)(1), which tells us that some things do not constitute 'consideration in money or money's worth.'" *Estate of Herrmann v. Commissioner*, 85 F.3d 1032, 1035 (2d Cir. 1996), *aff'g* T.C. Memo.

**[\*13]** 1995-90, 1995 WL 84623. Specifically, "a relinquishment or promised relinquishment of dower or curtesy, or of a statutory estate created in lieu of dower or curtesy, or of other marital rights in the decedent's property or estate, shall not be considered to any extent a consideration 'in money or money's worth'." I.R.C. § 2043(b)(1).[6] The purpose of this provision "was to eliminate a particular form of estate tax avoidance which involved the contractual conversion of a wife's dower (or other property rights she may have as surviving spouse) into a deductible claim against the gross estate." *Estate of Glen v. Commissioner*, 45 T.C. 323, 333 (1966).[7] In sum, a spouse's inheritance rights in the decedent's property do not constitute consideration under section 2053(c)(1)(A). *Estate of Rubin v. Commissioner*, 57 T.C. 817, 823–24 (1972), *aff'd without published opinion*, 478 F.2d 1399 (3d Cir. 1973).

Spousal rights of support and maintenance lie outside the strictures of section 2043(b) and accordingly are treated differently for purposes of section 2053(c)(1)(A). As the U.S. Court of Appeals for the Eleventh Circuit has observed, "the IRS does not dispute that the waiver of support rights may constitute full and adequate consideration under § 2053; nor could it." *Estate of Kosow v. Commissioner*, 45 F.3d at 1531; *see also Estate of Carli*, 84 T.C. at 657, 661; *Estate of Fenton v. Commissioner*, 70 T.C. 263, 275 (1978). "Therefore, the claim for payment after the death of the decedent, to the extent that it is based on such release [of spousal support rights], is deductible . . . as a claim based upon an adequate and full consideration in money or money's worth to the extent of the value of the . . . support rights." *Estate of Fenton*, 70 T.C. at 275.

---

[6] We look to section 2043(b)(1), as it applies "[f]or purposes of this chapter," i.e., "Chapter 11—Estate Tax." Although section 2043(b)(2) provides an exception to section 2043(b)(1), it is inapplicable here as it relates only to the circumstance where there has been a divorce within three years of a written agreement.

[7] "Normally, of course, a married couple will have no reason to structure bequests to each other as contractual debts" because the Internal Revenue Code provides a deduction from the taxable estate for most property transferred to the surviving spouse under section 2056(a). *Estate of Herrmann v. Commissioner*, 85 F.3d at 1035. As relevant here, "life estates (and other terminable interests), are not eligible for the marital deduction," otherwise "the value they represent would escape transfer tax both when the first and when the . . . surviving spouse die." *Id.*; *see also* I.R.C. § 2056(b).

**[\*14]**        2.        *Bequests and Right-To-Reside*

The Estate claimed a deduction under section 2053(a)(3) for the bequests of $1 million to each of Ms. Lueders's three children and the value of her five-year right to reside in the Easthampton property. These claims do not satisfy either the bona fide or the consideration requirements, however.

As an initial matter, the claims were not contracted bona fide but were "essentially donative in character." Treas. Reg. § 20.2053-1(b)(2)(i). Ms. Lueders's right to reside in the Easthampton property and the payments of $1 million did not stem from the performance under an agreement between Mr. Spizzirri and the various beneficiaries. *See* Treas. Reg. § 20.2053-1(b)(2)(ii)(D); *see also Estate of Woody v. Commissioner*, 36 T.C. 900, 904 (1961). To the contrary, these bequests were testamentary gifts, *see* Treas. Reg. § 20.2053-1(b)(2)(ii)(B), as evidenced by the Prenup's description (echoed in the Third Modification) that the provisions in Article IV were "in lieu of any other rights which may be available to [Ms. Lueders] as [Mr. Spizzirri's] surviving spouse" and the requirement that Mr. Spizzirri "make and keep in effect a will" embodying these arrangements. Nor has the Estate provided any evidence that Ms. Lueders and her children included these amounts as income, as might belie the conclusion that the payments under Article IV were gifts. *See id.* subdiv. (ii)(E).

We likewise conclude that the claims were not contracted for with adequate and full consideration in money or money's worth. In New York, prenuptial agreements are governed by traditional rules of contract interpretation. *Van Kipnis v. Van Kipnis*, 900 N.E.2d 977, 980 (N.Y. 2008). "As with all contracts, prenuptial agreements are construed in accord with the parties' intent, which is generally gleaned from what is expressed in their writing." *Id.* The parties here clearly took pains to keep the consideration for the relinquishment of each right separate and distinct, and we will not second guess their expressed intention.

Article IV of the Prenup addresses the parties' "waiver and release . . . of all rights in and to each other's estate" as surviving spouses. As relevant here, Ms. Lueders agreed to accept, inter alia, the right to reside in Easthampton for five years and a payment of $1 million to each of her children "in lieu of any other rights which may be available to her as the surviving spouse" of Mr. Spizzirri. The Prenup (as revised by the Third Modification) makes plain that the consideration for the

[*15] claims at issue is Ms. Lueders's waiver of her marital rights, which runs directly contrary to the prohibition staked out in section 2043(b).

The Estate responds that the claims at issue were supported by Ms. Lueders's waivers of spousal support and equitable distribution, asserting that the value of the waivers exceeded the value of the claims at issue. The Prenup refutes the Estate's argument, expressly specifying the property that Ms. Lueders would receive in the event of a dissolution of marriage "in consideration of her relinquishment of any rights she has or might have at such time to maintenance or support and any claims she has or might have to equitable distribution." The property promised to Ms. Lueders in Article V in consideration for the waiver of her spousal rights in the case of divorce is distinct from the property settled on Ms. Lueders and her children in Article IV (as modified) in exchange for inheritance rights. We see no reason to redraft the parties' agreement to reallocate the consideration that they specified for the relinquishment of certain rights. *See Estate of Morse v. Commissioner*, 69 T.C. 408, 418 (1977) ("[A] consideration hypothetically full and adequate within the statutory meaning has no relevance if the asserted consideration was not part of the bargain between the parties."), *aff'd per curiam*, 625 F.2d 133 (6th Cir. 1980).

Although we have had occasion previously to examine consideration in the context of "simple" antenuptial agreements, we do not believe that those agreements are apposite and thus our previous holdings provide no support to the Estate here. *See Estate of Pollard*, 52 T.C. at 744; *see also Estate of Herrmann v. Commissioner*, 1995 WL 84623, at *7–8. "[T]he determination whether the transaction imports a single contract or several contracts depends not on the number of promises or the number of things promised but on whether there has been a single expression of mutual assent to all the promises as a unit or whether the parties expressed their assent separately to the various promises." 15 Williston on Contracts (Williston) § 45:3 (4th ed. 2022). *Pollard* and *Herrmann* involved straightforward antenuptial agreements "in which the various obligations [were] mutually interdependent." *Estate of Pollard*, 52 T.C. at 744; *see also Estate of Herrmann v. Commissioner*, 1995 WL 84623, at *2–4, *7–8; 15 Williston § 45:3 (describing general dependency as a contract where "all the promised performances on both sides must be regarded as the agreed exchange for each other").

The Prenup, on the other hand, sets forth a highly reticulated scheme, with each article addressing a specific right and detailing the

**[\*16]** corresponding consideration. In this case, "the performance of a promise on one side may, by the terms of the agreement, be set off as an agreed exchange for a corresponding performance on the other side, although these performances may not be all the performances which the contract requires." 15 Williston § 45:3. In short, *Pollard* and *Herrmann* involve a type of contract different from the Prenup, in which there is "particular dependency between these promises of partial performance." *Id.* The result of the previous cases thus does not obtain.[8]

## C.    *Administration Expenses*

### 1.    *Legal Framework*

Section 2053(a)(2) allows a deduction from the gross estate for administration expenses as permitted by the laws of the state where the estate is administered, i.e., Colorado in this case. Treasury Regulation § 20.2053-3(a) explains that the deduction is "limited to such expenses as are actually and necessarily, incurred in the administration of the decedent's estate; that is, in the collection of assets, payment of debts, and distribution of property to the persons entitled to it." "The expenses contemplated . . . are such only as attend the settlement of an estate and the transfer of the property of the estate to individual beneficiaries or to a trustee . . . ." *Id.*

---

[8] Even if we were to conclude that we should not treat distinct articles distinctly, the Estate would fare no better. We and other courts have previously determined that the waiver of spousal support rights attendant to the dissolution of a marriage can constitute full and adequate consideration. *See, e.g.*, *Estate of Kosow v. Commissioner*, 45 F.3d at 1531–34; *Estate of Fenton*, 70 T.C. at 275. Courts have considered that a waiver of spousal support rights (or agreement to accept lesser support) as part of the arm's-length negotiations surrounding such a dissolution can constitute adequate consideration as it essentially augments the income of the spouse who otherwise would be responsible for support payments under state law. *See, e.g.*, *Estate of Kosow v. Commissioner*, 45 F.3d at 1531–34; *Leopold*, 510 F.2d at 624. This situation differs from one where a spouse prospectively trades away in an antenuptial agreement an unrealized, contingent right to support or maintenance in exchange for "the right to a definite part of her husband's estate." *See Estate of Herrmann v. Commissioner*, 85 F.3d at 1040–41. In that instance, "[w]hat [the waiving spouse] gave up added nothing to her [spouse's] estate; what she received depleted it." *Id.* at 1041. Similarly, Ms. Lueders's prospective relinquishment of her spousal support rights in the Prenup does not constitute full and adequate consideration.

We likewise reject the Estate's argument that the payments to Ms. Lueders's children qualified for the marital deduction of section 2056(a), as the payments were plainly not made to Mr. Spizzirri's surviving spouse. *See Estate of Spencer v. Commissioner*, 43 F.3d 226, 231 (6th Cir. 1995), *rev'g* T.C. Memo. 1992-579.

**[\*17]** "Expenses necessarily incurred in preserving and distributing the estate, including the cost of storing or maintaining property of the estate if it is impossible to effect immediate distribution to the beneficiaries, are deductible . . . ." Treas. Reg. § 20.2053-3(d)(1); *see also Marcus v. DeWitt*, 704 F.2d 1227, 1230 (11th Cir. 1983). "Expenses for preserving and caring for the property may not," however, "include outlays for additions or improvements; nor will such expenses be allowed for a longer period than the executor is reasonably required to retain the property." Treas. Reg. § 20.2053-3(d)(1). Moreover, expenses incurred to enhance the salability of a decedent's residence are generally not deductible under section 2053. *See Estate of Grant v. Commissioner*, T.C. Memo. 1999-396, 1999 WL 1111778, at \*10–11, *aff'd*, 294 F.3d 352 (2d Cir. 2002).

## 2. *Repairs to the Aspen House*

The Estate deducted on its return administration expenses including $314,890 for "emergency repairs due to unsafe conditions" and "continued maintenance" with respect to various decks at Mr. Spizzirri's Aspen house. The Estate argues in its reply brief that the expenditures were incurred to prepare the property for sale.

As an initial matter, the Estate did not raise this issue until its reply brief. We could accordingly deem this issue conceded or forfeited.[9] *See, e.g.*, *Clay v. Commissioner*, 152 T.C. 223, 236 (2019), *aff'd*, 990 F.3d 1296 (11th Cir. 2021); *Dutton v. Commissioner*, 122 T.C. 133, 142 (2004) ("Our practice is not to consider new issues raised for the first time in an answering brief.").

Even if we were to overlook this failure, the Estate has not proved its entitlement to deduct the deck repair expenses. On its tax return, the Estate claimed a fair market value based on a 2015 appraisal report on the Aspen property. That report noted that the decks showed signs of "considerable deferred maintenance" and that "the decking may need

---

[9] The Estate asserts in a conclusory statement in its opening brief that certain property maintenance expenses with respect to the Easthampton property are deductible. The Estate has failed to develop this argument and, consequently, has forfeited the issue. *See, e.g.*, *Rowen v. Commissioner*, 156 T.C. 101, 115–16 (2021) (explaining that a "litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace" (quoting *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005))).

**[\*18]** to be replaced," which it factored into its fair market value of $8.5 million.

Although the executor credibly testified as to his view that the decks "needed extensive repair in order to pass any inspection," his view was not echoed in the appraisal report (which did not address structural integrity), and the Estate has not provided any corroboration that the replacement of the decks was necessary for a sale or to maintain the fair market value claimed on its return. On the limited record before us we cannot say that the Estate has met its burden to show that the expenditures for replacing the decks were necessary for preservation and care of the property, rather than improvements to make the house more attractive for potential buyers.[10]

IV.    *Addition to Tax*

A.    *Section 6651(a)(1) Failure to Timely File*

Section 6651(a)(1) imposes an addition to tax for a taxpayer's failure to file a required return on or before the specified filing date, including extensions. As explained *supra* note 2, the Estate bears the burden of proof with respect to its liability for the addition to tax. *See Estate of Jackson*, T.C. Memo. 2021-48, at *248; *Estate of Ramirez*, T.C. Memo. 2018-196, at *32.

The addition to tax is inapplicable if the taxpayer's failure to file the return was due to reasonable cause and not to willful neglect. I.R.C. § 6651(a)(1); *see also United States v. Boyle*, 469 U.S. 241, 243 (1985); *Williams v. Commissioner*, T.C. Memo. 2022-7, at *4. The Estate bears the burden of proof with regard to the "reasonable cause" exception to section 6651(a). *See Boyle*, 469 U.S. at 245; *Higbee*, 116 T.C. at 447.

"Reasonable cause" exists if the taxpayer exercised ordinary business care and prudence but was nevertheless unable to file the return on time. *See McMahan v. Commissioner*, 114 F.3d 366, 368–69 (2d Cir. 1997), *aff'g* T.C. Memo. 1995-547; Treas. Reg. § 301.6651-1(c)(1). Reliance on a tax professional can constitute reasonable cause if that professional advises the taxpayer on a substantive tax issue, such as whether a liability exists or a return must be filed. *Boyle*, 469 U.S. at 250–51. To claim reasonable reliance on professional advice, the

---

[10] Although the Estate submitted as a proposed trial exhibit some fragmentary documentation relating to these expenses, the Estate did not move for the exhibit's admission at trial. We accordingly do not consider it.

[*19] taxpayer must prove that "(1) [t]he adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002).

B.     *Failure to Establish Reasonable Cause for Failure to Timely File*

The Estate acknowledges that it did not file a timely return but asserts that its failure was due to reasonable cause and not willful neglect. Specifically, the Estate identifies Ms. Lueders's probate litigation as the reason for the delay, claiming that it did not want to file an incomplete or misleading return. The Estate, however, "was required to file a timely estate tax return based upon the "best information available'" and then, if necessary, file an amended return." *Estate of Wilbanks v. Commissioner*, T.C. Memo. 1991-45, 1991 WL 11522, *aff'd*, 953 F.2d 651 (11th Cir. 1992); *see also* Treas. Reg. § 20.6081-1(c) and (d). We see nothing to indicate that the probate litigation deprived the Estate of sufficient information to file a proper return.

The Estate further claims that it had reasonable cause for failing to file the estate tax return because it relied upon its tax return preparer to obtain a second extension of the filing date. Although Mr. Langer attempted to obtain a second extension, he credibly testified that he advised the Estate to file the return before the August 12, 2016, extended deadline. The Estate thus fails to establish that it reasonably relied on professional advice. *See Schweizer v. Commissioner*, T.C. Memo. 2022-102, at *8.

The Estate finally contends that the net amount due on the date prescribed for payment was zero because it remitted an overpayment before the filing deadline and that the penalty should be based on that amount. The penalty for the late filing of estate tax returns applies, however, even when full payment is made on time. *See Estate of Liftin v. United States*, 754 F.3d 975, 978 (Fed. Cir. 2014).[11]

---

[11] The Commissioner concedes that the IRS made a calculation error in determining the penalty, which stemmed from its treatment of the Estate's timely payment of $11.8 million. Consistent with the parties' agreed calculations, the addition to tax shall be reduced to $120,299.

**[\*20]** V.    *Conclusion*

For the reasons set forth above, we will sustain the deficiency determinations by the IRS, subject to concessions made by the Commissioner and any related computational adjustments.    The Estate's liability for the addition to tax under section 6651(a)(1) shall be reduced to $120,299.

To reflect the foregoing,

*Decision will be entered under Rule 155.*